2 Ill. App.3d 185 (1971)
275 N.E.2d 905
VERONICA SCULLY et al., Plaintiffs-Appellees, Appellants-Cross-Appellants,
v.
OTIS ELEVATOR COMPANY, et al., Defendants-Appellants-Cross-Appellees  (J.L. SIMMONS COMPANY, INC., Counter-Plaintiff-Appellant.)
No. 53867.
Illinois Appellate Court  First District.
October 12, 1971.
Rehearing denied November 9, 1971.
*186 *187 *188 *189 *190 John J. Sullivan and William J. Harte, both of Chicago, for appellants.
Forrest L. Tozer, Thomas W. Dempsey, and Clausen, Hirsh, Miller & Gorman, all of Chicago, for appellees.
Judgment affirmed.
Mr. JUSTICE STAMOS delivered the opinion of the court:
Plaintiffs, as widow and lineal heirs of the decedent Robert Scully, instituted this action against defendants alleging violations of the Structural Work Act (Ill. Rev. Stat. 1961, ch. 48, par. 60-69.) Defendants in the cause were Otis Elevator Company, J.L. Simmons Co., Inc. and the architectural firm of Berners, Scober & Kilp. A counter-claim for indemnity was also instituted by Simmons against Otis. The jury found in favor of plaintiffs and against Otis and Simmons. Damages were assessed at $400,000 in favor of plaintiff Veronica Scully and $150,000 in favor of each of the minor plaintiffs. The jury also found in favor of Berners, Schober & Kilp and against plaintiffs. On the counter-claim the jury found in favor of counter-defendant Otis and against counter-plaintiff Simmons.
Plaintiffs and defendants, Otis and Simmons, all filed post-trial motions requesting judgments notwithstanding the verdicts or in the alternative, new trials. In its post-trial motion, Otis also requested a remittitur as alternative relief. The trial court denied all the post-trial motions contingent upon the two minor plaintiffs, by their mother and next friend, filing written consents in reduction of judgment. The consents to remittitur were filed and the court entered judgments in favor of plaintiff Veronica Scully in the amount of $400,000; in favor of the minor plaintiff John Scully in the amount of $95,000; and in favor of the minor plaintiff Kathleen Scully in the amount of $105,000. Otis appeals from the judgments entered against it and in favor of the plaintiffs. Simmons appeals from the judgments entered against it and in favor of the plaintiffs and *191 counter-defendant Otis. Plaintiffs cross-appeal from the entry of the remittitur.
The evidence reveals that defendant, Berners, Schober & Kilp, was hired to design an addition to St. Joseph's Hospital in Joliet, Illinois. It was to prepare preliminary plans and prime contract and generally administer construction. Eleven prime contracts were awarded in the construction of the addition. No sub-contracts were involved. Two of these contracts were awarded to defendants Simmons and Otis. Simmons contracted with the hospital to handle all of the general work including excavation, masonry, concrete and finishing. Simmons was also directed by the architects to prepare a critical path schedule of the work in order to coordinate the efforts of the other contractors. Otis contracted to install eight elevators and dumbwaiters. The Simmons and Otis contracts provided that Simmons was to prepare the shafts for the installation of the elevators.
On July 25, 1962, Robert Stein, an architect, told James Dempsey, Otis' foreman, that he wanted Otis to work on elevator shafts six and seven, since the bricklayers and terrazzo men were being delayed in their work schedules in that area. However, Dempsey informed Stein that Otis could not work on those shafts because Simmons had constructed a bricklayers' scaffold over shaft seven at the eighth floor. Later the same day, Vern Castell, Simmons' Construction Superintendent, informed Dempsey that he would make arrangements with his bricklayer foreman, James Delaney, to prepare for Otis' work.
The next morning at 8:30 A.M. Dempsey told Delaney that openings would have to be cut in the scaffold over shaft seven to enable Otis to proceed with the installation of the elevators. The openings were necessary so that plumb lines could be dropped into the shaft to accurately align the elevator guide rails. Dempsey also told Delaney that there would be men working beneath the scaffold in the shaft cleaning out the pit which extended seven feet below basement level. The pit had been designed to accommodate equipment capable of stopping an elevator's descent. Delany at first objected to the opening of the holes for safety reasons, but eventually consented. Dempsey told Simmons' carpenters the size and location of the required openings. After the openings were cut some of Simmons' bricklayers placed pallets of bricks on the scaffold to facilitate their work in the area. They also took the metal retaining bands off the pallets. Dempsey went to the tenth floor and dropped four plumb lines in shaft six[*] and four plumb lines in shaft seven. The plumb *192 lines extended from the tenth floor, through the openings in the scaffold, to the basement.
Dempsey intended to anchor the plumb lines in the basement. However, when he went to the basement, he discovered that Simmons' laborers were cleaning out the elevator pit. When Dempsey discovered Simmons' workers in the pit, he warned them that bricklayers were working above them on the scaffold. Since Dempsey was unable to proceed with the measurements until the pit was cleaned, he returned to shaft one where he had been working previously.
Later in the day Dempsey returned to the pit in shaft seven and learned that the Simmons' workers were unable to dry the pit due to a drainage problem. Castell asked Scully, plaintiffs' decedent and a plumber, to help with the problem. Scully obtained a test plug and handed it down to one of the men in the pit. As he leaned over to look into the pit, he was struck on the head and fatally injured by a brick which fell from the scaffold. The only bricklayers working in the shaft were on the eighth floor scaffold. On the eighth floor Delaney had seen two or three bricks fall through one of the openings in the scaffold. The bricks fell because of the vibration caused by the hydraulic buggy that Simmons' workers were using to carry the brick pallets. Shortly before the accident, Melville Anderson, Simmons' masonry foreman and Delaney's superior, had seen the openings in the scaffold and told someone to cover them. The openings were again ordered to be covered by Delaney just before the accident.
Otis contends that there was no proof that it had "charge" of the work within the meaning of section 9 of the Structural Work Act, hence it is entitled to a judgment notwithstanding the verdict. Alternatively Otis contends that it is entitled to a new trial, since the verdict finding it liable under the Act was against the manifest weight of the evidence.
 1-3 Section 9 of the Structural Work Act renders liable, "any * * * contractor * * * having charge of the erection, construction, repairing, [or] alteration * * * of any building * * * within the provisions of this act," who wilfully violate its provisions.
In Larson v. Commonwealth Edison Co. (1965), 33 Ill.2d 316, the court was confronted with the issue of whether there was a need to instruct jurors with the definition of the statutory words "having charge of." The court stated at page 323:
"We do not believe such a need exists. It is well established that the meaning of words, used in their conventional sense, need not be defined or explained in giving instructions to the jury. [cited authority.] The term "having charge of" is one of common usage and understanding, *193 and it is our opinion that further attempt at definition can only lead to confusion and error."
From the evidence the jury could have reasonably concluded that Otis was in charge of that segment of the work in the area of shafts six and seven involving the installation of elevators which resulted in Scully's death. Otis was bound by its contract with the owners of the hospital to install the elevators. To facilitate the work of the other contractors Otis began work in shafts six and seven. Otis' foreman Dempsey directed the Simmons employees in the area to clean out the elevator pit. He also directed them to cut openings in the scaffold which rendered it unsafe. Dempsey testified that he was in charge of the work to the extent of preparing the Simmons scaffold for the elevator installation. Moreover, it appears that Dempsey was in charge of the complete operations of the elevator installation. The mere fact that Simmons was also present in the same work area fulfilling its contractual obligations does not absolve Otis of liability. It is now well settled that more than one person can be in "charge." Gannon v. Chicago, Milwaukee, St. Paul and Pacific Ry. Co. (1961), 22 Ill.2d 305.
 4 Otis also suggests that since Simmons could have properly refused to cut the openings in the scaffold, Otis was not truly in "charge." We do not find this argument meritorious. While Simmons was also in "charge" of work in the area and violated its duty to render safe the scaffold, the direction to alter the scaffold was supplied by Otis. This direction touched Otis' area of work and Otis must necessarily be deemed to have been in "charge" irrespective of the alternative courses of action open to Simmons.
 5, 6 Therefore, the trial judge correctly denied Otis' motion for judgment n.o.v. The evidence when viewed in its aspect most favorable to plaintiffs did not so overwhelmingly favor Otis that no contrary verdict could stand. (Pedrick v. Peoria and Eastern RR. Co., 37 Ill.2d 494.) Moreover, the verdict of the jury was not clearly and palpably erroneous or against the manifest weight of the evidence so as to warrant a new trial. Russell v. Rowe, 82 Ill. App.2d 445.
Otis next contends that the trial court erred in instructing the jury as to the provisions of the Structural Work Act. Specifically, Otis cites Plaintiffs' Instructions 15A, 17 c and 18 which substituted "work" and "work in question" for the statutory language of having charge of the "erection, construction, repairing, alteration, removal or painting of any building, bridge, viaduct or other structure within the provisions of this act." Otis also contends that the peremptory burden of proof instruction (Plaintiffs' Instruction 17c) was further misleading because it did not *194 tell the jury that plaintiffs were required to show that Otis was in charge at the time of the accident.
 7, 8 Instructions are to be considered as a series. (Miller v. DeWitt, 59 Ill. App.2d 38.) When so considered in the present case we find no error. Plaintiffs' Instruction 13A paraphrased the provisions of the Structural Work Act and in particular utilized the exact language omitted in the instructions complained of.
Otis maintains that the "redeeming" effect of Plaintiffs' Instruction 13A was obliterated by final argument of plaintiffs' counsel wherein he stated that the substance of the Structural Work Act was contained in the burden of proof instructions. However, since the jury was instructed to consider the instructions as a whole, we find no prejudice accruing to Otis.
 9 We similarly find Otis' contentions with regard to Plaintiffs' Instruction 17c without merit. Otis maintains that the court erred in failing to instruct the jury that plaintiffs had to prove each defendant had charge at the time of the accident. Otis deems the time factor critical to the issues of the case and cites Campione v. Henry C. Lytton & Co., 57 Ill. App.2d 147, 158. However, in Campione the defendant had left the premises and could no longer have been in charge. In the present case Otis was still on the job site and had not finished its work in shafts six and seven. Otis' plumb lines were still suspended in the shafts. Otis' foreman was at the scene of the accident inspecting the elevator pit. Therefore, no issue as to time existed. Otis was either in charge at all times herein pertinent or never in charge.
Otis next contends that the trial court erred in refusing to submit Otis' special interrogatory which read:
"Do you find from the evidence that Otis Elevator Company was in charge of the erection or construction at the time and place of the accident in question?"
Plaintiffs maintain that the court properly refused the special interrogatory since it could have misled the jury. Plaintiffs reason that the interrogatory could not test the general verdict since it did not reflect the applicable case law under the Structural Work Act which only requires a party to have charge of a phase of the erection or construction to be deemed liable.
 10, 11 Special interrogatories are used to test the general verdict against the jury's conclusions concerning the ultimate controlling facts. (Ill. Rev. Stat. 1969 ch. 110 par. 65; Mathias v. Baltimore & O.R. Co., 93 Ill. App.2d 258.) When a special interrogatory is in proper form, the trial court has no discretion but to submit it to the jury. (Pushauer v. Demers, 86 Ill. App.2d 251.) However, the special interrogatory must *195 relate to an ultimate issue of fact. (Mathias, supra.) While Otis' special interrogatory was couched in the language of the Act, it did not relate to an ultimate issue of fact, because a negative answer would not be determinative of whether Otis was in charge within the meaning and intent of the Structural Work Act as defined by case law. Therefore, the special interrogatory could not have tested the general verdict and the trial court properly refused to submit it to the jury.
Otis next contends that the trial court erred in submitting to the jury Plaintiffs' Instructions 15A and 17c, since each singled out and emphasized certain evidence to the prejudice of Otis. Plaintiffs' Instruction 15A related to the issues in the case and in its pertinent parts read:
"The plaintiffs claim that Robert Scully was injured while working on the premises of St. Joseph's Hospital, employed as a plumber of the plumbing contractors, and died subsequently as a result of those injuries.
Plaintiffs further allege that the defendants, and each of them, were in charge of the work in question, and that Robert Scully's death was proximately caused by one or more of the following violations of the Structural Work Act:
(a) The scaffold used in erection and construction of the building was not erected, constructed, placed and operated as to give proper and adequate protection to the life and limb of any person passing under or by the same.
(b) The scaffold used in erection and construction of the building was not erected, constructed, placed and operated in such manner as to prevent the falling of any material that may be used or deposited thereon.
(c) There were holes in the scaffold contrary to the custom and practice in the industry.
(d) The holes in the scaffold were not covered nor were barricades placed around them to prevent the falling of material placed on the scaffold."
Plaintiffs' Instruction 17c was the burden of proof instruction which in its pertinent parts read:
"Plaintiffs have the burden of proving each of the following propositions as to each of the defendants:
First: that the defendant violated the Structural Work Act in one of the ways claimed by the plaintiffs as stated to you in these instructions; * * *."
Otis reasons that there were many other facts in addition to the holes in the scaffold which combined to cause the accident; that of all the facts that combined to cause the accident, the holes were the only one *196 which Otis had anything to do with and that therefore, since holes were the only factor mentioned in the instructions, Otis was unduly prejudiced.
 12 Other facts which Otis cites as having induced the accident are the architect's directions to Otis to start work in shafts six and seven; the act of Simmons in continuing the bricklaying after the openings were cut; Simmons bringing brick pallets on the scaffold; Simmons taking the bands off the pallets and Simmons vibration of the unbanded pallets. While it might have been error to exclude these factors we need not decide the issue on that basis for no prejudice accrued to Otis. The other facts cited by Otis did not relate to Otis' liability, but rather to that of the other defendants. Obviously, Otis was not unduly singled out from the other defendants, since the jury also returned a verdict against Simmons. Therefore, we do not find Otis' contention meritorious.
Otis next contends that plaintiffs' counsel's cross-examination of Dempsey, Otis' foreman, was so prejudicial as to require a new trial. Plaintiffs called Dempsey to testify under Section 60 of the Civil Practice Act (Ill. Rev. Stat. 1967, ch. 110 par. 60.) Plaintiffs' counsel repeatedly questioned Dempsey as to his knowledge of the Structural Work Act. Otis' counsel objected on nine separate occasions to this line of inquiry and the court sustained five of these objections. Dempsey's knowledge of the Structural Work Act was irrelevant to any issue in the case. Moreover, plaintiffs' counsel's repeated inquiries into this irrelevant matter was improper.
 13 However, while such questioning was improper we find no prejudice accruing to Otis which would require reversal. The sole issue for the jury's determination with regard to the existence of Otis' liability was whether it was in charge within the meaning of the Structural Work Act. We have already held that there was sufficient evidence from which the jury could have reasonably concluded that Otis was in charge.
Otis next contends that it was error to admit into evidence Plaintiffs' Exhibit #5 and that the error was subsequently compounded by the argument of the attorneys for plaintiffs and Simmons. Dempsey, Otis' foreman, had testified that two working days after the accident the plumb lines were still suspended in shaft seven and that no further work was done in the shaft until two months later. Subsequently, plaintiffs called Otto E. Sporer, who testified that he had taken the picture labeled Plaintiffs' Exhibit #5; that it portrays an elevator shaft on the eighth floor of the construction site at St. Joseph's Hospital ten days after the accident, and that the picture was taken for Simmons. Plaintiffs then offered the picture into evidence for the limited purposes of showing the appearance of pallets, center beams and shafts and to impeach *197 Dempsey's testimony wherein he allegedly stated that the plumb lines remained in place for two months. Otis objected to the admission of the picture and a conference was held outside the presence of the jury. The trial court sustained Otis' objection insofar as it contained matter which might impeach Dempsey's testimony. However, the court allowed its admission to show the appearance of pallets, center boards and shafts and to show the general appearance of the area ten days after the accident.
During closing argument Otis' counsel referred to the picture and pointed out to the jury that there was a hole in the scaffold shown in the picture. Otis' counsel asked the jury to consider this in relation to the evidence of Simmons' seeming concern over safety. In obvious rebuttal to this argument Simmons' counsel commented that it could be inferred that the hole was still present ten days after the accident because the Coroner might be interested in viewing the scene as it was the day of the accident. Otis contends that even though the jury was directed to disregard the colloquy relating to the picture as impeachment of Dempsey's testimony, its admission into evidence and the remarks of Simmons' counsel were constant reminders that plaintiffs' counsel had maintained that the picture contradicted Dempsey's testimony. We find no merit in this contention. Plaintiff's Exhibit #5 could not have impeached Dempsey's testimony since Dempsey did not state that the plumb lines remained in place at all times during the two month period following the accident. Additionally since the plumb lines were only one-sixteenth of an inch thick, there was no showing that the picture would have portrayed the lines even if they had been present.
 14, 15 After plaintiffs' counsel stated that the picture impeached Dempsey's testimony, it was within the discretion of the trial court to exclude it from evidence or admit it for the limited purpose of pictorial reproductions of the objects of interest (pallets, center beams, and shafts) with direction to the jury to disregard counsel's remarks. (Baggett v. Ashland Oil & Refining Co., 92 Ill. App.2d 433.) We find no abuse of this discretion. Moreover, it is to be presumed that the jury followed the direction of the court. Danile v. Oak Park Arms Hotel, Inc., 55 Ill. App.2d 2.
 16 With regard to the remarks of Simmons' counsel which Otis contends compounded the original prejudice, these were made only in response to those made by Otis' counsel who himself violated the ruling of the court utilizing the picture beyond the limited purpose enunciated. Otis cannot now complain about such invited response. Schneider v. Kirk, 83 Ill. App.2d 170.
Otis next contends that the voir dire examination of prospective jurors *198 by plaintiffs' attorney was so prejudicial that a new trial is required. Otis had presented a motion in limine to the trial court to instruct plaintiffs' counsel not to mention any specific sum of money during voir dire. The court denied Otis' motion and stated, "the plaintiff may so inquire, within the limitation, of course, of not fixing as certain an amount in the minds of the jurors."
During the course of voir dire, plaintiffs' counsel used the figure of $600,000 in framing questions to the prospective jurors. Otis contends that the usage of this figure in the context of the questions propounded indoctrinated each juror into thinking that an award for a lesser sum would be unjust and unfair.
The figure of $600,000 was utilized six times in framing questions to the prospective jurors. Counsel inquired whether the figure of $600,000 was a figure the prospective jurors "could not possibly consider under any circumstances * * *"; whether the figure of $600,000 would "scare" them; and whether a recovery of that amount would be "too much money for anybody."
 17 The purpose of voir dire is to secure an impartial jury. (People v. Lobb, 17 Ill.2d 287.) While counsel may inquire to determine prejudice, he cannot indoctrinate or persuade the jurors. (Christian v. New York C.R. Co., 28 Ill. App.2d 57.) The defendant in Murphy v. Lindahl, 24 Ill. App.2d 461, 470 raised the same contention as Otis raises here, alleging indoctrination of the jury. The court therein held that there was no error in eliciting answers showing the attitude of the prospective jurors toward returning a $300,000 verdict because:
"[S]ome prospective jurors may have had fixed opinions, which indicate bias or prejudice against large verdicts, and which might not readily yield to proper evidence."
 18 The questions propounded by plaintiffs' counsel in the instant case were similarly designed to expose any latent prejudice against large verdicts. We find no indoctrination present and no prejudice accruing to Otis.
Otis next contends that the trial court erred in submitting to the jury Plaintiffs Instruction No. 16A on damages over Otis' objection. Otis maintains that the instruction improperly directed the jury to consider pecuniary loss as under the Wrongful Death Act instead of "direct damages" sustained by persons "dependent for support" under the Structural Work Act and also improperly instructed the jury that the law recognizes a presumption of some substantial pecuniary loss where the decedent leaves a widow and lineal next of kin. Otis also maintains that assuming arguendo the propriety of a pecuniary loss test, the instruction *199 was misleading because the jury was required to consider decedent's future earnings but not future expenses.
Section 9 of the Structural Work Act provides:
"For any injury to person or property, occasioned by any wilful violations of this act, or wilful failure to comply with any of its provisions, a right of action shall accrue to the party injured, for any direct damages sustained thereby; and in case of loss of life by reason of such wilful violation or wilful failure as aforesaid, a right of action shall accrue to the widow of the person so killed, his lineal heirs or adopted children, or to any other person or persons who were, before such loss of life, dependent for support on the person or persons so killed, for a like recovery of damages for the injuries sustained by reason of such loss of life or lives."
Otis argues that since the wording of this section limits recovery only to those widows and lineal heirs who were dependent for support upon decedent, the Liquor Control Act (Ill. Rev. Stat. 1969, ch. 43 par. 94-195) is an analagous statute. The measure of damages under the Liquor Control Act has been differentiated from the measure under the Wrongful Death Act in Knierim v. Izzo, 22 Ill.2d 73. However, plaintiffs argue that Mines and Miners Act (Ill. Rev. Stat. 1961, ch. 93 par. 10.07) is in pari materia.
In Mitseff v. Acme Steel Co., 208 F. Supp. 805 the court stated at page 807:
"The only reasonable inference is that the Scaffolding Act was copied from the Mines and Miners Act but that the limitation on the amount of recovery in the earlier law was omitted."
 19 In O'Fallon Coal Co. v. Laquet, 198 Ill. 125, the court was confronted with the issue of whether the jury was properly instructed as to the measure of damages in an action brought by a lineal heir of a decedent under the Mines and Miners Act. Section 33 of the Mines and Miners Act was identical to the pertinent part of Section 9 of the Structural Work Act quoted above except that recovery was limited to $5,000. The instruction complained of in the case similarly included pecuniary damages in place of the term direct damages. That court held that the statutory term "direct damages" limited recovery to "pecuniary loss." The latter term was defined as "the value of the life of the parent," as determined by the parent's future earning potential to the extent it would go to family support and the estimated value of his normal parental services. (O'Fallon Coal Co., supra, at 127.) In using the terms "direct damages" and "pecuniary loss" interchangeably, the court apparently viewed the purported distinction as semantical rather than substantive. *200 We agree and find there was no error in instructing the jury to consider plaintiffs' "pecuniary loss."
 20 As to Otis' contention that the instruction was misleading since the jury was called to consider decedent's future earnings but not future expenses, we similarly find no error. Paragraph A3 of Plaintiffs' Instruction No. 16A directed the jury in determining pecuniary loss to consider, "What he spent for customary personal expenses." This amount would necessarily be a deduction against his future contributions.
Otis next contends the verdict was grossly excessive and the result of either passion and prejudice or the pledges improperly obtained on voir dire. Otis asks for a new trial or in the alternative a substantial further remittiture of damages. Simmons similarly makes the same contention. On plaintiffs' cross-appeal they contend that the evidence warrants the original verdict of the jury and therefore, they request reinstatement of the original verdict or in the alternative, affirmance of the judgments in the amount ordered by the trial court.
 21 Under the Structural Work Act plaintiffs were entitled to recover the direct damages incurred by reason of the death of Robert Scully. We have already held that the "direct damages" as utilized in the statute means the pecuniary losses to which plaintiffs were subjected. Pecuniary damages have traditionally been held to consist of the value of the sum of monetary contributions and personal services the decedent would have provided. (O'Fallon Coal Co. v. Laquet, supra.) The original jury verdicts in favor of plaintiffs were returned in the amounts of $400,000 for the widow and $150,000 for each of decedent's two minor children. The two minors subsequently consented to remittiturs reducing the amounts to $95,000 for John Scully and $105,000 for Kathleen Scully.
The evidence reveals that decedent was 38 at the time of his death and had a life expectancy of 33.6 years. He left surviving him a wife, 35, and two children, 5 and 3. He had recently been promoted to the position of foreman in the plumbing trade in Joliet, Illinois. In 1968 a foreman would have made $12,911 excluding overtime which was readily available in the Joliet area. The present value in 1962 of decedent's wages for a life expectancy of 34 years invested at 5% would be approximately $209,000.
Decedent's health had been very good although he previously had an ulcer condition. His personal expenses consisted of $200 a year for clothes and a couple of dollars a week for coke or milk with the lunch his wife prepared for him. He also expended some funds on gas, tools, and union dues. With respect to the personal services decedent rendered his family, the evidence reveals that he did all the plumbing and helped the electrician and heating contractor. He did the painting, *201 decorating, and landscaping. After completion of the home, he built a recreation room.
Decedent spent most of his non-working hours at home. The family did everything together such as going on picnics and visiting friends. He took John to Mass and almost every place he would go to visit or do chores. He helped the children at bedtime and taught them their evening prayers. He also did all the repair work around the home.
Initially, plaintiffs and defendants Otis and Simmons take issue over the legal efficacy of the utilization of inflationary trends and present value calculations in calculation of damages. It has been held to be error to present evidence to the jury of future inflationary trends. (Raines v. New York Cent. R. Co., 129 Ill. App.2d 209.) However, since the jury was not presented with such evidence nor instructed to consider it, we do not find the issue pertinent to resolution of the appeal.
We similary find no pertinency in the issue as to present value and its method of calculation, since the jury was properly instructed and the parties take no issue with the instruction.
The remaining issue between the parties as to damages is whether the amount of $700,000 or even the amount of $600,000 after remittitur, was justified in light of the $209,000 discounted value of decedent's future earnings. According to the measure of damages, the excess over the future contributions represents the value of decedent's personal service to the plaintiffs over the period of his life expectancy.
Initially, we note that defendants again complain of the voir dire examination of prospective jurors and the alleged "indoctrination" by plaintiffs' counsel. However, since we have already decided the point, we need not discuss it here.
In Smelcer v. Sanders, 39 Ill. App.2d 164, the court stated at page 173:
"[T]he question is whether reasonable men might differ in their answers to the question of the damages; we cannot substitute our judgment for that of the jury; reasonable men might differ here, and because we think they might we cannot say the jury was moved by passion or prejudice or other improper motive: [cited cases.]"
 22 Similarly, in the present case it is not clear that all reasonable men would agree that the amount was excessive due to all the imponderables involved. The trial court was in a better position to evaluate the verdict and granted a remittitur in the amount of $100,000. Without other indications of passion or prejudice of the jury, we cannot now say that the judgment as entered after remittitur was excessive.
Therefore, we affirm the judgments in favor of plaintiffs and against Otis and Simmons as entered.
On its appeal Simmons contends that the trial court erred in failing *202 to direct a verdict in its favor, or in the alternative grant a new trial, on its claim for indemnity. Simmons maintains that it is entitled to indemnity since the evidence established that Simmons merely acted as Otis' agent and that Simmons was passively negligent while Otis was actively negligent.
 23 Otis contends that Simmons waived its right to raise the theory of agency on the question of indemnification since it was not argued in the trial court. The question of agency in the present case is one of law and not of proof and, therefore, Simmons is not barred from asserting this contention. (Hux v. Raben, 38 Ill.2d 223.) Additionally we note that Simmons implicitly argued the agency theory in the trial court in contending that it was merely an instrumentality of Otis. (See J & R Electric Co. v. Edward P. Allison Co., 125 Ill. App.2d 123). However, we find that the agency theory of indemnification has no applicability in the present case.
 24-27 With regard to the active-passive issue, the jury was instructed that if it found from all the evidence that the quality of misconduct of Simmons was of the same degree or character, or was greater in degree or character, than that of Otis, then the verdict must be for Otis. This was a correct statement of the law. The jury was therefore presented with alternative theories upon which it could have based a general verdict for third-party defendant. Its general verdict for defendant should not be set aside if evidence was presented which was legally sufficient to support either of these theories. Goldschmidt v. C.T.A., 335 Ill. App. 461, 470. The proper standard to be applied is whether the verdict is contrary to the manifest weight of the evidence. Biel v. Wolff, 126 Ill. App.2d 209, 224. We hold that there was sufficient evidence upon which the jury could have concluded that the misconduct of Simmons was either equal to or greater than the misconduct of Otis. The court did not err in denying Simmons' motion for a new trial. What we have said also disposes of Simmons' contention that a verdict should have been directed in its favor.
We affirm the judgment.
Judgment affirmed.
LEIGHTON, P.J., and SCHWARTZ, J., concur.
NOTES
[*] The scaffold over shaft six had pre-existing openings through which the plumb lines were dropped.