DOROTHY MCNELLIS, Admr. of the Estate of Charles B. McNellis, Deceased, *et al.*, Plaintiffs-Appellees, *v.* COMBUSTION ENGINEERING, INC., *et al.*, Defendants—(COMMONWEALTH EDISON COMPANY, Defendant-Appellant.)

(No. 58145;

First District (4th Division)—July 25, 1973.

Pretzel, Stouffer, Nolan & Rooney, of Chicago, (Joseph B. Leder-leitner, of counsel,) for appellant.

A. Denison Weaver, of Chicago, for appellees.

Mr. PRESIDING JUSTICE BURMAN delivered the opinion of the court:

Dorothy McNellis, individually and as administrator of the estate of Charles B. McNellis, deceased, brought this action in the Circuit Court of Cook County to recover various damages resulting from fatal injuries sustained by her husband while unloading a piece of equipment from a railroad car at a construction site. The original complaint, filed August 30, 1965, consisted of six counts. Named as defendants were Commonwealth Edison Company, owner of the premises, Combustion Engineering, Inc., the prime contractor, Air Preheater Company, manufacturer of the equipment, and the Elgin, Joliet and Eastern Railway, supplier of the car.

Count I charged all four defendants with negligence in loading the car and in failing to warn the decedent that the equipment as loaded was inherently dangerous. Count II contained substantially the same allegations and sought damages under the family expense statute (Ill. Rev. Stat. 1969, ch. 68, par. 15). Counts III and IV charged the Elgin, Joliet and Eastern with providing a car of improper design for the intended load and with failing to provide adequate fixtures within the car to secure the load. Counts V and VI charged Commonwealth Edison with negligence in permitting Combustion Engineering to perform the unloading in an unsafe manner and in failing to provide the decedent with a safe place in which to work.

On July 11, 1967, an additional count was filed and also designated as Count VI. This count charged Commonwealth Edison and Combustion Engineering with violating certain provisions of the Structural Work Act (Ill. Rev. Stat. 1969, ch. 48, par. 60 et seq.) in that they failed to provide adequate stays and supports to secure the equipment within the car. On October 20, 1970, the day of trial, an amended complaint was filed in which this count was replaced with a similar one, designated Count VII, charging Commonwealth Edison and Combustion Engineering with violating the Structural Work Act in that they failed to provide adequate stays and supports, failed to operate a crane located at the job site in such a way as to prevent the equipment from falling as it was unloaded and wilfully placed the crane in an unsafe and unsuitable manner by failing to attach it to the load. The defendants objected to the filing of the amended complaint on the grounds that it invoked for the first time a Structural Work Act recovery in an action five years old, that it added a new party (Dorothy McNellis individually), that it enlarged the areas of recovery and that the Structural Work Act is an unconstitutional preference to a certain class of persons.

In the early part of the trial, court granted a directed verdict in favor of the Elgin, Joliet and Eastern Railway on Counts III and IV of the amended complaint. At the close of the evidence, it directed a verdict in favor of the defendants on Count II. Following this, the plaintiff withdrew Counts I, V and VI, leaving only count VII to go to the jury. The jury returned a verdict against the plaintiff and in favor of Combustion Engineering. No appeal was taken from this judgment. The jury also returned a verdict in favor of the plaintiff and against Commonwealth Edison and assessed damages at $160,000. Judgment was entered on the verdict and Commonwealth Edison appealed directly to the supreme court, alleging that the constitutionality of the Structural Work Act was in issue. The supreme court transferred the cause to this court for disposition.

The pertinent facts are as follows. In 1961 Commonwealth Edison and Combustion Engineering entered into a written agreement under the terms of which Combustion was to design and fabricate two steam generating units and deliver them to the site of a power plant being constructed by Commonwealth Edison near Joliet, Illinois. The agreement included an option, exercisable by Commonwealth Edison, to require Combustion to perform the additional work of unloading, erecting and finishing the units. Commonwealth Edison exercised this option sometime prior to September, 1963. The units were to be shipped to the job site in pieces and assembled within the power station building, which was being constructed by another contractor. With the approval of Commonwealth Edison, Combustion subcontracted the task of unloading the various components of the units and erecting them to Power Systems, Inc.

Construction material was brought to the job site by rail. Commonwealth Edison provided a number of temporary sidings to be used by the contractors for unloading and storing such materials. Cars destined for the job site were dropped off on one of the sidings by the Elgin, Joliet and Eastern Railway, then moved to an appropriate location for unloading or storage by the construction crews, who used a device known as a track mobile owned by Commonwealth Edison.

The sidings were located approximately one half mile from the site of the building. Material which arrived at the site ahead of schedule was unloaded and stored in the vicinity of the sidings until needed. It was then reloaded on flatcars or trucks and transported to the building for installation.

In August, 1963, the Air Preheater Company, a division of Combustion Engineering located in Wellsville, New York, loaded two axial seal pedestals into a railroad gondola car for shipment to the job site. The

pedestals were components of air preheaters, which, in turn, were part of the steam generating units to be furnished by Combustion. Each pedestal was approximately 115 inches long and weighed 20,000 pounds. In appearance each resembled a curved rectangle. Hanging off of each was a single flat plate approximately twelve feet long. The width of each piece tapered from 139 inches to 70 inches. The two pedestals were loaded in the car parallel to each other and parallel to the sides of the car. They were secured to the car by "tie rods" which extended from the pedestals through holes in the sides of the car and were capped off with nuts. They were also secured by pieces of scrap steel, which were welded to both the pedestals and the sides and bottom of the car.

On September 3, 1963, a yard crew employed by Power Systems undertook to unload the pedestals from the car. The crew consisted of Ray Suska, the foreman, James Chaney, Charles McNellis and an unidentified man. All of the men were journeyman boilermakers and had unloaded similar equipment before. Prior to unloading the four men examined the pedestals to determine the best method of removing them. In the vicinity of the car were two cranes having lifting capacities of 30 and 50 tons respectively. Operators were assigned to both cranes. Both were in good operating condition and neither was being used on any other job. They considered attaching a line from one of the cranes and taking a strain on it prior to cutting loose the scrap which held the pedestals in place. However, the three crew members decided that the "braces would hold" and that they would go ahead without the cranes. This was the decision of the foreman as well.

Chaney and McNellis climbed into the car and began cutting the plates with a torch. Chaney did the actual cutting while McNellis kept the hose straight and held the torch as Chaney moved around the load. Four pieces of scrap held the load to the car. When Chaney cut the fourth plate, the pedestals fell, pinning McNellis to the side of the car. The crew righted the plate with the 50 ton crane and freed McNellis, but he died six weeks later as a result of his injuries.

On appeal Commonwealth Edison contends the following:

1. that the classification of employees granted or denied benefits by the Structural Work Act is not related to work that is either "structural" or "extra hazardous" and is so vague and arbitrary as to render the statute unconstitutional;

2. that the verdict is against the manifest weight of the evidence;

3. that the court should have directed a verdict for the defendants;

4. that the verdict is excessive.

We direct our attention first to the constitutional arguments. Commonwealth Edison contends that the trial court's ruling that the Struc-

ural Work Act is constitutional "is prejudicially erroneous because the act * * * is special legislation effecting a classification scheme bearing no discernible relationship to the realities of life, in violation of Section 22 of Article IV of the Illinois Constitution and the due process and equal protection clauses of the U.S. Constitution, Amendment 14, Sec. 1." This is based upon the assertions that the statute as drafted provides special benefits to men engaged in the erection of buildings, but does not provide any equivalent rights to men who are engaged in other occupations which are equally hazardous and that the trial court extended the coverage of the statute to work that is neither structural in nature nor extra hazardous.

■■ Initially we agree with Commonwealth Edison that these grounds go beyond those raised and passed upon by the supreme court in *Kennerly v. Shell Oil Co.*, 13 Ill.2d 431. We also agree that a decision sustaining the constitutionality of a statute is not decisive of its validity against subsequent attacks upon different grounds. *Grasse v. Dealer's Transport Co.*, 412 Ill. 179.

The constitutionality of the Structural Work Act was attacked on the ground that it is special legislation in *Claffy v. Chicago Dock Co.*, 249 Ill. 210. The Illinois Supreme Court upheld its validity, stating that it represented a proper exercise of police power by the legislature. In *Chicago Dock Co. v. Fraley*, 228 U.S. 680, the United States Supreme Court considered an appeal from the Illinois court's decision in *Claffy*. There the appellant again argued that the classifications set up by the statute were arbitrary, stating that "in a case like this use cannot be made the test. Danger is the thing." In affirming, the Supreme Court said:

> "That danger is the test may be conceded, but there may be degrees of it, and a difference in degree may justify classification. * * * The legislation cannot be judged by abstract or theoretical comparisons. It must be presumed that it was induced by actual experience * * *. If it be granted that the legislative judgment be disputable or crude, it is notwithstanding not subject to judicial review. We have said many times that the crudities or even the injustice of state laws are not redressed by the Fourteenth Amendment." 228 U.S. at 686.

In both *Chicago Dock Co.* cases the arguments of the appellant were directed to section 7 of the Structural Work Act of 1907 (Laws of 1907, p. 312) which provided that the shafts of elevators or hoisting machines used in the construction of buildings (but not in their repairing, alteration or removal, hence the appellant's argument) should be protected by barricades. However, the principles enunciated in both decisions are broad enough to extend to the argument made by Common-

wealth Edison in the present case. The appellant's contention in *Fraley* that the test should be one of danger and not use is precisely the argument employed by Commonwealth Edison in its assertion that the hazard involved in the occupation is the only rational basis for a classification and not the occupation itself.

■■ In such cases there is a presumption that the classification established by the legislature are based upon actual experience. (*Fraley v. Chicago Dock Co.*, 228 U.S. 680, 686.) The circumstance that the legislature has not chosen to deal with the entire field of permissible legislation in one act does not violate the constitution. (*Fraley*, p. 687.) It is well known that the erection, repair and alteration of buildings and structures is a dangerous occupation. This is amply demonstrated by the myriad of cases which have arisen under the provisions of the Structural Work Act since its enactment. Therefore we cannot agree with Commonwealth Edison that the legislative classification conferring special benefits upon men engaged in this occupation bears no relationship to the realities of life. That the legislative did not provide for all men engaged in occupations which involve some degree of danger does not render the act invalid.

Commonwealth Edison also argues that unloading a railroad car is not per se structural work or work that is extra hazardous. It contends that by extending the benefits of the act to persons engaged in such work the trial court has established a classification of persons within or without the act that is so vague and arbitrary as to deny it due process of law.

It appears to us that this argument is similar to that made in *Kennerly v. Shell Oil Co.*, 13 Ill.2d 431. There the appellants argued that section 1 of the Structural Work Act, which provides that all scaffolds shall be erected in a safe and suitable manner, was vague and incomplete and denied them due process of law because it did not define clearly what constitutes a safe and suitable scaffold. In rejecting this argument the court pointed out that the great variety of construction sites and working conditions made it impossible for the legislature to define in detail what should be a proper scaffold in all situations. What might be proper for one type of job would be improper for another. The court further pointed out that the constitution does not prevent the legislature from dealing with such a problem and that to establish the principle that whatever the legislature may do, it must do in every detail or not at all would virtually destroy the process of government.

■■ The same considerations apply to the present case. Many different jobs are engaged in by men whose general occupation is the erection of buildings and structures. For the legislature to have attempted to define

all of them in detail would have been a difficult and pointless undertaking. The purpose of the Structural Work Act is to prevent injuries to persons employed in dangerous and extra hazardous work. (*Bounougias v. Republic Steel Corp.*, 277 F.2d 726), and the act must be construed liberally in order to carry out its purpose. *Gannon v. Chicago, M., St. P. & P. Ry.*, 22 Ill.2d 305.

With this in mind we think it necessary to examine the trial court's conclusion that the work being done by McNellis at the time of the occurrence was a Structural Work Act activity. We concede that there is nothing inherent in the act of unloading a railroad car which would cause it to fall within the purview of the act. However, as indicated above, we believe that the proper approach to whether it should in a particular case is to evaluate the facts of that case. After reviewing the facts of the present case we conclude that McNellis was entitled to the protection of the act at the time that he sustained his fatal injuries.

■■ The written agreement between Commonwealth Edison and Combustion Engineering provided that Combustion should "unload, store and/or remove from storage, erect and finish in a workmanlike manner * * * air heaters * * *." This duty was delegated to the subcontractor, Power Systems, Inc., which performed the actual work. It is clear that all parties involved understod that Power Systems assumed the general task of erecting the generators within the power station and that this would necessitate the incidental tasks of unloading and storage. Thus it may be said that McNellis, as an employee of Power Systems, was engaged in the overall occupation of erecting the steam generating units at the time of the incident which resulted in his death. That he was engaged in the specific task of unloading some parts of the structure later to be erected is immaterial.

Commonwealth Edison places great emphasis on the fact that the area in which the unloading was done was located approximately one-half mile from the building and also that the axial seal pedestals were not actually installed until some time after they were unloaded. This apparently is an attempt to isolate the act of unloading and remove it in time and space from the act of erecting the units. However, we believe that this emphasis is misplaced. It is apparent from the record that the power generating facility was a unique structure and that the circumstances of its construction, as well as the size and nature of some of its components, dictated that unloading be performed some distance from the actual building. In addition, we note that the written agreement itself defined the premises as the place where the work was to be done, including all places contiguous thereto and in the vicinity thereof where materials were stored or kept, and we believe that the

record fairly demonstrates that the unloading in question was an integral part of the entire operation of erecting the generating units. When it is viewed in this manner, the time and place at which it occurred are of little significance.

It is common knowledge that construction materials do not appear on a job site of their own accord, but must be transported there and unloaded before they may be incorporated into the structure being built. We believe that the legislature in drafting the Structural Work Act realized that of necessity some work done on and around structures would involve the unloading of construction materials. Therefore to place such activity within the coverage of the act does not stretch it beyond foreseeable limits.

Commonwealth Edison also likens the axial seal pedestals to a lathe, drill press or other piece of plant equipment and urges that if we find that unloading the pedestals was a Structural Work Act activity we shall be required in the future to extend the benefits of the act to any person injured while unloading merely a piece of equipment. We are not so persuaded. We perceive a fundamental difference between the examples cited and the present case. The record establishes that the unloading being performed by McNellis was a hazardous operation. The pedestals were large and extremely heavy. They were irregularly shaped and were loaded in such a way as to make them unstable and unwieldy to handle. It should have been apparent to all concerned that there existed a strong potential of serious injury or death if the unloading were done improperly.

We conclude that the trial court was correct in finding that McNeillis was engaged in a Structural Work Act activity at the time of the occurrence and we so hold. We conclude further that the trial court's application of the statute to the present case does not result in a classification of persons entitled to receive the benefits of the act that is so vague and arbitrary as to amount to a denial of due process of law.

Having concluded that the act is constitutional we direct our attention to the contention that the court erred in refusing to direct a verdict in favor of Commonwealth Edison. With respect to this, Commonwealth Edison argues that the evidence most favorable to the plaintiff demonstrates that the work engaged in by McNellis at the time of the occurrence was not a Structural Work Act activity and that it did nothing over and above engaging an independent contractor who was in charge of the work.

In *Pedrick v. Peoria and Eastern R.R. Co.*, 37 Ill.2d 494, our supreme court set forth the standard to be followed in granting directed verdicts:

"In our judgment verdicts ought to be directed  *  *  *  only

in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." 37 Ill.2d at 510.

Our discussion which follows, of Commonwealth Edison's contention that the verdict is against the manifest weight of the evidence applies with equal force here. The record is replete with evidence which, taken in the light most favorable to the plaintiff, supports the jury's findings that McNellis was engaged in a Structural Work Act activity at the time of the occurrence, that Commonwealth Edison was in charge of the work and that it violated the provisions of the act.

Commonwealth Edison also relies upon *Crafton v. Lester B. Knight & Assoc., Inc.,* 46 Ill.2d 533, wherein the court found as a matter of law that the Structural Work Act did not apply and that the trial court should have directed a verdict in favor of the defendants. It argues that the facts in *Crafton* are indistinguishable from those in the present case. We disagree. In *Crafton* the plaintiff was working with two other iron workers moving structural steel from a rail siding to the site of the actual construction. They were using a tractor equipped with a thirty foot side-boom hoist, which was being operated by an operating engineer. The tractor was used exclusively to haul structural steel from the siding and storage area to the site of the building several hundred yards away. The area between the storage yard and the place of erection was covered with mud ranging in depth from six inches to two feet. The plaintiff and his fellow iron workers tied a bundle of steel to the cable hoist which was attached to the tractor. The plaintiff then climbed up on the tractor as he usually did to ride to the building site. As he did so, the tractor lurched and he was injured. After reviewing the record the court concluded as a matter of law that the plaintiff's injuries resulted from the lurching of the tractor rather than the operation of the hoist.

■■ As indicated above, the evidence in the present case is such that we cannot say as a matter of law that McNellis's injuries were unrelated to Commonwealth Edison's failure to insure that the cranes were properly attached and operated so as to prevent the load from falling. For this reason the present case is distinguishable from *Crafton* and we find no merit in the contention that the trial court should have directed a verdict for the defendants.

We direct our attention next to the contention that the verdict is against the manifest weight of the evidence. The Structural Work Act was intended to place full responsibility for employee injuries upon the person in charge of the work who wilfully violates the provisions of the act. (*Bryntesen v. Carroll Const. Co.,* 27 Ill.2d 566.) After reviewing the

record we believe that there is sufficient evidence for the jury to have found that these conditions were met.

The agreement between Commonwealth Edison and Combustion provided, among other things, that Combustion's personnel should consult with representatives of Commonwealth Edison as to the method to be used in unloading and bringing the equipment into the building for erection and that Combustion should comply with the provisions of the Structural Work Act and carry on the work in a proper and safe manner. In the event that Commonwealth Edison's engineers concluded that the work was not being carried on in a safe manner the agreement gave them the right to order the work stopped. Commonwealth Edison retained the right to make changes in the scope of the work at its discretion and to approve all subcontractors. These provisions were incorporated by reference into the subcontract between Combustion and Power Systems. Commonwealth Edison also had the right to direct the contractor or any subcontractor to remove any employee which Commonwealth Edison designated as unfit or unskilled.

Leo Burke, one of Commonwealth Edison's engineers, testified that there were between seven and eight Commonwealth Edison employees on the job site during the course of construction. George Gandsey, an employee of Power Systems, testified that there were as many as fourteen to sixteen Commonwealth Edison people present on the site. Burke testified that it was the function of the Commonwealth Edison employees to make inspections of the work in progress. Burke acknowledged that he had the right to stop the work of any contractor if it was being carried on in an unsafe manner.

■■ The foregoing contractual provisions, as well as the activity of Commonwealth Edison during the course of construction, are similar to those outlined in *Sola v. City of Chicago*, 82 Ill.App.2d 266. There the defendant owner argued that it was not in charge of the work in that it had merely hired an independent contractor. The court held that whether the defendant was in charge of the work was a question for the jury, stating:

> "In this case the contract for construction gave defendant the right to approve all safety facilities and the right to require changes or modifications in scheduling, methods, structures, and equipment used (these may be changed for safety purposes). Defendant had an engineer on the job at all times who worked closely with the contractor's crew, and who could alter the procedures by communicating with the crew foreman, although the engineer could not direct the workers himself. In light of the foregoing cases, these circumstances are sufficient to require a

jury determination of whether defendant was in charge of the work involved in the accident." 82 Ill.App.2d at 273-74.

There is ample evidence in the record to support the jury's finding that Commonwealth Edison was in charge of the work at the time of the occurrence.

Section 1 of the act provides that "[a]ll \* \* \* cranes \* \* \* erected or constructed by any person, firm or corporation in this State for the use in the erection \* \* \* of any \* \* \* building \* \* \* or other structure, shall be erected and constructed, in a safe, suitable and proper manner, and shall be so erected and constructed, placed and operated as to give proper and adequate protection to the life and limb of any person or persons employed or engaged thereon \* \* \*." (Ill. Rev. Stat. 1969, ch. 48, par. 60.) In the present case it is undisputed that there were two large cranes in the vicinity of the car which Mc-Nellis was helping to unload. These cranes were in good operating condition and had operators assigned to them. Their obvious purpose was to unload heavy objects such as the axial seal pedestals, and they had been used in this way earlier in the day on September 3. George Gandsey, the field superintendent for Power Systems, Inc., testified that in his opinion the proper way for the crew to have removed the pedestals would have been to attach a line from one of the cranes to them and take a strain on it prior to cutting the bracing loose. This would have held the pieces upright as the braces were cut. In our opinion this was sufficient for the jury to have found that if the cranes had been properly utilized to support the pedestals as the braces were cut they would not have toppled. Further the jury could have found that the failure to attach one of the lines to the pedestals and to operate the crane in such a way as to prevent the pedestals from falling was as much a violation of the act as if the crane had been attached and the cable had snapped causing the pedestal to fall. As stated in *Louis v. Barenfanger*, 39 Ill.2d 445:

> "From a realistic viewpoint, if the failure to provide scaffolding would not be actionable under this statute, then every person to whom the Act was directed could defeat its purpose by simply failing to provide a scaffold, stays or supports." 39 Ill.2d at 448-49.

■■ Finally we consider the contention that the verdict is excessive. Commonwealth Edison brings to our attention two cases from other jurisdictions which are similar to the one presently before us and in which lower verdicts were returned. It argues by comparison that the verdict in the present case is excessive and represents a sympathy assessment. We do not believe that the propriety of a verdict can be determined from a comparison with other cases. Each case must be considered

on its own facts, and a determination of the amount of the plaintiff's damage is peculiarly within the province of the jury. *Lau v. West Towns Bus Co.*, 16 Ill.2d 442. As we said in *Scully v. Otis Elevator Co.*, 2 Ill. App.3d 185:

> "[T]he question is whether reasonable men might differ in their answers to the question of the damages; we cannot substitute our judgment for that of the jury * * *." 2 Ill.App.3d at 201.

■■ In the present case, considerable evidence was presented as to McNellis's earning potential and habits of thrift and industry. This was sufficient for the jury to have assessed the damage to his widow and children at $160,000, and we cannot say as a matter of law that this figure was the result of passion or prejudice.

For the foregoing reasons the judgment of the Circuit Court of Cook County is affirmed.

Affirmed.

ADESKO and DIERINGER, JJ., concur.