**William R. DAUGHERTY, Plaintiff,**

v.

**PFIZER, INC., Defendant-Third Party Plaintiff,**

v.

**BAZAN PAINTING CO., Third Party Defendant.**

No. 82–5121.

United States District Court, S.D. Illinois.

March 16, 1983.

Bruce Cook, Belleville, Ill., for plaintiff.

Jeffery S. Hammel, Belleville, Ill., for Pfizer.

Thomas J. Frawley, St. Louis, Mo., for Bazan.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

BEATTY, District Judge.

The plaintiff, William Daugherty, brought this action pursuant to the Illinois Structural Work Act, Ill.Rev.Stats.Ch. 48, Sec. 60–69 (1981), for injuries suffered when he fell from the top of a ladder while painting a "dirty liquor storage tank" owned by the defendant, Pfizer, Inc. The matter was tried before this Court and after having duly considered the evidence and arguments of counsel, it makes the following findings of fact and conclusions of law.

At the time of his injury, the plaintiff was a 36 year old journeyman high steel painter employed by the Bazan Painting Company. Pursuant to a contract entered into between his employer and the defendant for the scraping and painting of two such storage tanks, the plaintiff and another employee of Bazan, Christopher Reynolds, were sent to the defendant's facility in East St. Louis, Illinois. The tanks in question were structures of a cylindrical nature more than 30 feet high. A 32 foot aluminum extension ladder and airless spray gun

were provided by Bazan to do the job. To paint the tanks the plaintiff was required to ascend the ladder to a height of 25 feet with spray gun in hand and air hoses trailing behind to a paint pot below. Mr. Reynolds was to hold the base of the ladder, fill the paint pot, assist with the air hoses and check the tanks for spots the plaintiff had missed. Prior to beginning the work, the plaintiff specifically questioned his superiors at Bazan concerning the safety of employing the ladder for this type of job. The plaintiff was nonetheless instructed to use the ladder.

The plaintiff and Mr. Reynolds then scraped and painted the tanks in the manner they were instructed. They were not tying the ladder off to the top of the tank. Several times a day, the defendant's project engineer, Bernie Bosse, inspected the work being done by Bazan. Bosse admitted he had observed the plaintiff and Reynolds employing the aluminum extension ladder in the manner described. Mr. Bosse testified that he did not instruct the painters to tie the ladder off to the top of the tank. There was further evidence that other Pfizer employees were frequently in the area and could have observed the manner in which the ladder was being employed.

On the third day of the job, February 21, 1981, the plaintiff fell to the ground from the top of the ladder, a distance of approximately 25 feet. Mr. Reynolds testified that just prior to the plaintiff's fall, they had moved the ladder to a new position, the plaintiff had ascended the ladder with Reynolds holding it and the plaintiff had commenced spraying the tank. Reynolds then moved away from the ladder to attend the paint pot. Shortly thereafter Reynolds saw the ladder falling laterally. As a result of the fall, the plaintiff fractured bones in his foot, heel, leg, hip, hand and wrist.

The contract between Bazan and the defendant provided that the painting was to be done under the supervision of the defendant's project engineer. The contract required Bazan to comply with Pfizer plant safety rules and specified that the defendant's project engineer would provide those rules to all outside employees upon their initial entry into the plant. Those rules included a provision that all portable ladders must be tied off at the top. The defendant's project engineer could not recall giving a copy of these rules to any Bazan personnel. Incredibly, Mr. Bosse admitted he was not even aware of the rule provision concerning the tying off of portable ladders.

This case graphically illustrates the need for and the purposes served by the Illinois Structural Work Act. The set of circumstances surrounding this plaintiff's fall dramatizes just how worker safety can succumb to the economic pressures of the competitive bidding market place. This particular project was described by a Bazan employee as a "loss leader". That is, Bazan intentionally submitted a contract bid price which was less than the actual costs it would incur in the scraping and painting of the tanks. Such a strategy was pursued in an effort to acquaint Pfizer with the services Bazan Painting could provide and thereby ideally lead to the award of future contracts with Pfizer.

Safety precautions obviously increase the costs incurred in any project. Actually requiring the painters in this case to tie their portable ladder off at the top of the tank or to employ alternative methods such as scaffolding, staging or cherry pickers to reach the elevated work would have significantly raised the costs of this project. An executive of Bazan Painting testified that just tying off the ladders would have doubled the cost of this job. Such additional costs may well have precluded Bazan from pursuing such a "loss leader" strategy. In any event, the manner in which these painters were instructed to employ the ladder was indeed the most cost effective way for Bazan to do the job. Sadly, as is evidenced by the plaintiff's fall, it was also the most hazardous for the painters.

The objective of the Illinois Structural Work Act is to deter injuries to individuals engaged in certain dangerous and extra hazardous occupations which require them to be on or make use of scaffolds, ladders

and other like contrivances employed in and about the erection, repair, alteration, removal or painting of any house, building, bridge, viaduct or other structure. *Schultz v. Henry Ericsson,* 264 Ill. 156, 106 N.E. 236 (1914). To promote job safety in these situations, the Act imposes financial responsibility upon persons having charge of the work being done for personal injuries suffered by such workers as the result of a wilful violation of the Act. *McNellis v. Combustion Engineering, Inc.* 13 Ill.App.3d 733, 301 N.E.2d 96 (1973). In other words, the Act seeks to expose all the various entities involved in certain designated activities to potential financial liability for workers' injuries in order to promote their concern and participation in job site safety. The Act additionally reflects a recognition of the inherent limitations that the Illinois Worker's Compensation system has in advancing worker safety.

An owner who solicits competitive bids for an undertaking involving the designated activities is in a peculiarly influential position from the inception of such a project to insure worker safety. The owner is the only party in the competitive bidding situation that can truly insure that the bids received do adequately reflect the additional costs that job site safety requires. An owner cannot be allowed to gain financially by accepting a bid which has sacrificed safety to economic considerations. The threat of potential liability for worker injuries that the Illinois Structural Work Act provides is an incentive needed to counteract market place pressures imposed upon safety precautions. The owner's primary concern is to secure the construction of a specified building or project at the lowest possible price and it is to this end that competitive bidding is employed. By placing such downward pressures on the price that a contractor must bid to obtain the contract, the owner may well be encouraging the contractor to cut corners in the area of worker safety. As noted above, the tying off of ladders, setting up proper staging or scaffolding and other safety precautions take time and are expensive.

The usual construction contract calls for the work to be done in a "safe and workmanlike manner". The owner cannot through his architect or inspectors insist on compliance with high standards of workmanship and materials and then subsequently be allowed to disclaim responsibility for worker injuries resulting from the low standards of safety being employed. Always, the owner will get only what he pays for. Absent the sanctions of the Structural Work Act, the owner has little if any economic interest in the extent to which the contractor safeguards the life and limb of the construction worker.

This Court finds that the defendant was in charge of the work being done within the meaning of the Illinois Structural Work Act. There is ample evidence in the record supporting this conclusion based on factors traditionally considered such as contractual right to control by the owner, job site inspection by the owner, actual control of the project by him and his reservation of the right to stop ongoing work at the site. However, this Court believes that because an owner utilizing competitive bidding is in sole control of the pursestrings of a project and thereby has actual control of the safety standards employed on a job site, such an owner should be held in charge of the work being done as a matter of law. As noted above, the owner in such situations is in a peculiarly influential position from the start of a project to insure worker safety and is truly the only party that can make certain that the bids submitted do reflect adequately the additional costs that safety requires. Adding these considerations to the other factors traditionally looked to in determining whether a party is in charge of the work being done can only further the proclaimed purposes of the Structural Work Act.

■ The evidence presented at trial conclusively establishes that at the time of his fall the plaintiff was engaged in an activity within the scope of the Structural Work Act and that the defendant, Pfizer, Inc., was one of the persons having charge of the work being done. Further, this Court finds

that the plaintiff's fall from the ladder and the injuries he sustained are a direct result of a wilful violation of the Structural Work Act by Pfizer, Inc. On the issue of liability under the Illinois Structural Work Act, this Court accordingly finds for the plaintiff, William Daugherty, and against the defendant, Pfizer, Inc.

On the issue of damages, it is evident from the plaintiff's testimony and the medical evidence that the plaintiff has sustained a massive and permanent injury as a result of his fall. The Court was able to observe the plaintiff during the trial and it was apparent that he could not sit without discomfort and that he walked with a pronounced limp and obvious pain. Plaintiff's treating orthopedic physician indicated that plaintiff is permanently unemployable in any type of work. That testimony also indicated plaintiff suffered a severe emotional problem as a result of his disability and pain.

The plaintiff's testimony was that he is unable to perform any physical activity and is in constant, excruciating pain. Plaintiff has a high school G.E.D. and always has done physical work. Because of the hazardous nature of his employment his current rate of pay, if working, would be $16.12 per hour, plus insurance and retirement benefits. Plaintiff's wife testified that her husband, prior to his accident, was a positive person who enjoyed baseball, jogging, and other types of sports, as well as being a "handy" person around the home. She further testified that he is now extremely depressed and sleeps about 16 hours a day. She stated that he is unable to perform any useful activity around the house.

It is apparent to the Court that the plaintiff's massive injuries prevent him from ever again engaging in the same type of work that he was performing at the time of his injury and further, that the persistent pain and virtual loss of the use of his right hand makes him nearly unemployable for most types of gainful occupation. The plaintiff's capacity to earn has been permanently and very nearly totally impaired.

The plaintiff offered testimony of Professor Leroy Grossman, an economist at St. Louis University. Professor Grossman offered testimony concerning the present cash value of the plaintiff's future wage loss. While the Court questions some of the figures and conclusions presented, Professor Grossman's testimony stands unrebutted and the Court accepts it with certain reservations as the present cash value of the plaintiff's future wage loss.

The Court finds that the portion of Professor Grossman's testimony that predicts the present cash value of the plaintiff's future wage loss in light of a probable retirement age of 65 and a probable future wage increase of 6% is more likely correct than the figures which are based on an 8% increase and retirement at age 70. However, the Court's observations of the construction industry brings it to the conclusion that most people in plaintiff's hazardous occupation of high steel painting, and probably plaintiff, as they become older, no longer desire to go high and forfeit the premium pay associated with that extra-hazardous employment. For this probability, the Court will reduce the figure of $458,994.00, which reflects the present cash value of the plaintiff's future lost wages, by 10%. The Court further finds that in the future the plaintiff probably will engage in some type of minimal employment and further reduces the figure of $458,994.00 by an additional 10%, reflecting this likelihood. The Court, therefore, finds the present cash value of plaintiff's future wage loss to be the sum of $367,195.00. The Court further finds that plaintiff's wage loss and proven medical expenses amounts to $56,980.00. The Court finds that just compensation for plaintiff's past and future pain and suffering amounts to $100,000.00 and that damages for disability and disfigurement are assessed in an amount of $100,000.00. Accordingly, the Court enters judgment for the plaintiff and against the defendant and assesses damages in the sum of $624,175.00 plus taxable costs.