Irene Wells, Plaintiff-Appellee-Cross-Appellant, *v.* Web Machinery Company *et al.,* Defendants-Appellants—(Minneapolis-Honeywell Company *et al.,* Defendants-Cross-Appellees-Counterdefendants-Appellees; Web Machinery Company, a corporation, Counterplaintiff-Appellant-Third-Party Plaintiff-Appellant; R. D. Werner Company, Inc., Third-Party-Defendant-Appellee.)

(No. 57960;

First District (4th Division)—June 26, 1974.

Baker & McKenzie, of Chicago (Francis D. Morrissey and Harry J. O'Kane, of counsel), for appellant Web Machinery Company.

Kralovec, Sweeney, Marquard & Doyle, of Chicago (Charles V. Kralovec and Edward V. Scoby, of counsel), for appellant Service Machine Company, Inc.

William J. Harte, of Chicago (Kevin M. Forde, Philip Rock, and Michael E. McNulty, of counsel), for cross-appellant Irene Wells.

Hackbert, Rooks, Pitts, Fullagar and Poust, of Chicago (John G. Poust, Terrence E. Kiwala, and James G. McConnell, of counsel), for appellee Honeywell, Inc.

Burns and Williams, of Chicago (Robert L. Williams, of counsel), for appellee Revere Electric Supply Company.

Mr. JUSTICE DIERINGER delivered the opinion of the court:

In this case there are three appeals from judgments and orders entered in the Circuit Court of Cook County as follows: (1) defendants Service Machine Company and Web Machinery Company appeal from the verdict and judgment for plaintiff against them in the sum of $800,000; (2) plaintiff, Irene Wells, appeals from the judgment entered upon a directed verdict in favor of defendant Honeywell, Inc., and defendant Revere Electric Supply; (3) defendant Web Machinery Company appeals from the orders dismissing its counterclaims against defendant Honeywell, Inc., and defendant Revere Electric Supply, and the order dismissing its third-party complaint against third-party defendant R. D. Werner Company, Inc.

The numerous issues presented for review are discussed hereinafter.

This is an action originally brought by the plaintiff for damages resulting from injuries to her hands on March 1, 1967, in the operation of a punch press. The defendants named were Service Machine Company ("Service"), the manufacturer of the punch press; Web Machinery Company ("Web"), the distributor of the press; Honeywell, Inc. ("Honeywell"), the manufacturer of a component part of the press; and Revere Electric Supply ("Revere"), Honeywell's distributor.

Plaintiff's initial complaint was in two counts raising the theories of negligence and strict liability. With leave of court, plaintiff later amended the complaint alleging breaches of warranty, both express and implied.

In due course in this litigation several cross-actions were filed among the various defendants. Web filed counterclaims against Service, Honeywell and Revere for implied indemnity alleging theories of negligence, implied warranty and strict liability. Web also filed a third-party complaint against the plaintiff's employer, R. D. Werner, Inc. ("Werner") for indemnity on a theory of negligence. Revere also filed a counterclaim against Honeywell for indemnity alleging theories of negligence and strict liability. Service filed a third-party action against Werner.

Following trial of this cause, a verdict was returned in favor of the plaintiff against Service and Web in the amount of $800,000. Motions for a directed verdict by Honeywell and Revere were granted and judgment was entered thereon. Judgment was also entered for Web on its counterclaim against Service. Prior to trial, Web's counterclaim against Honeywell and Revere had been dismissed by the motion court and at the time of trial the trial judge denied Web's motion to vacate that order. The third-party complaints of Service and Web against Werner were also dismissed following the entry of the verdict and judgment in favor of the plaintiff and against Service and Web.

The various appeals taken from the proceedings in the trial court are set forth above.

It does not appear that Service has appealed from the judgment entered against it and in favor of Web on indemnity, nor from the order dismissing Service's third-party complaint against Werner.

The pertinent facts are somewhat complex. On March 1, 1967, the plaintiff suffered severe and disabling injuries to her hands while forming ladder steps for Werner on a Rousselle punch press. The ladder steps were formed by the ram of the press which was set in single cycle operation. It is undisputed that the plaintiff was free from any misconduct on her part which would defeat her cause of action.

The punch press in question was manufactured by Service in 1965 and was shipped to Web, its distributor, on April 16, 1965. The original design

of the press, and specifically the electrical circuitry on the press, was formulated in 1953 solely by William Heim, the president of Service at that time.

In its single-cycle operation, the punch press is activated by the pressing of two palm buttons by the operator. This action initiates the downward movement of the ram, which comes down to exert a pressure of 60 tons against the die in the bed of the press. As the press continues its single cycle operation, the ram returns to an up position and is supposed to stop at the top by the action of a limit switch. The design of the press is such that a triangular shaped ram, mounted on the crankshaft, presses in the actuator arm of the limit switch causing the actuator arm to depress a plunger of the switch, which in turn interrupts the electrical current causing the machine to stop. In the event there is no interaction of the actuator arm there would be no interruption of the electrical current and the press would continue to cycle, that is, the ram would continue to go up and down until the electrical circuit was interrupted by some other means.

On the day prior to the occurrence in question, Werner's maintenance man, Pat Scotti, was ordered by his foreman, Noel Peters, to replace the limit switch which was originally placed on the press by Service. This original switch bore the tradename "Licon" and was manufactured by the Illinois Tool Works, a firm not a party to the lawsuit. The switch which was replaced bore the tradename "Microswitch" and was manufactured by Honeywell. It is undisputed that these two types of switches were interchangeable on the press involved.

The next day, March 1, 1967, at about 8 A.M., the plaintiff set the press for single cycle operation and had worked with it for some 6 hours with no problems. About 2 in the afternoon in the process of her work, she had placed an aluminum form in the bed of the press and then activated the press by pressing the palm buttons so that the ram came down to bend the aluminum into a step and then went back up. She then reached into the bed of the press to remove the step when, without warning, the ram came down and caught her hands. It continued to cycle and strike her hands causing severe injuries to them. She was taken immediately to the hospital.

After the accident, Werner's foreman, Noel Peters, made an examination of the press to determine what had occurred and discovered that part of the actuator arm on the microswitch was missing. Consequently there was no way to interrupt the electrical current when the ram reached the top of its stroke and the ram would therefore continue operating although set for single cycle operation. Peters removed the switch from the press and dismantled it in the presence of Robert Werner, vice-

president of Werner. They determined that there was nothing else wrong with the switch other than the broken actuator arm.

Plaintiff offered substantial evidence of the defective design of the press.

Under cross-examination as an adverse witness, William Heim, Service's former president and the only person in the employ of Service who had anything to do with design of the press and its electrical circuitry, testified that his formal education ended with graduation from Tilden High School. He started with Service in 1943 or 1944, and prior to the design of the press involved in 1953, had no formal education with respect to the design of presses or the electrical circuitry in presses. The original design by him in 1953, which he stated could have been copied from some other manufacturer's circuitry, provided for a closed circuitry wiring. This meant that there would be electrical current to maintain the circuitry until the current was broken by action of a limit switch.

Heim further testified that the original design of the circuitry remained unchanged to the date of the occurrence. Heim admitted that in 1953 he knew that if the circuitry was designed in a closed position rather than open, the failure of a single limit switch would have stopped the press. He was also aware as early as 1955 that Honeywell was marketing a trip control containing two limit switches and in 1960 or 1961 he knew that other manufacturers of presses or component parts such as Munster and Niagara, like Honeywell, offered a tandem limit switch control, wherein, if one switch failed, a second or third switch would keep the machine operating properly and prevent recycle in a single cycle operation. He admitted those designs were safer and, despite this awareness, he did nothing to change the design of the press or the circuity.

In 1963, Heim caused certain information to customers to be placed in the Service Instruction Book, a manual accompanying the sale of a press, stating the reason for the failure of the press to stop or to recycle while in single cycle operation was either the limit switch was not properly positioned or was defective. He admitted that in the event of a recycling on a single cycle operation, the ram could catch the hands of a person while hand-setting something in the die area. Heim further stated that the Service presses were advertised as being fail-safe; however, he admitted that the fact the press would recycle in the event of the failure of the single limit switch in single cycle operation means that the machine was not designed in a fail-safe manner.

Robert E. Janis, the present president of Service who was sales manager on the date of the sale of the machine to Werner in 1966, also identified the customer information in Service's 1963 customer instruction

manual relative to the possibility of recycling because of a defective limit switch. He stated in 1963 he and the company were aware of this possibility of recycling while the machine was on single-stroke setting, but to his knowledge no change in the design was made thereafter to the date of the occurrence. He also testified that Heim was the only person within Service who would make any change in the design of the press or its electric circuitry.

Eugene Scheiblauer, a mechanical engineer employed by Honeywell, testified that as early as 1954 Honeywell had developed a control package for power presses which contained a minimum of two and sometimes three limit switches and which was sold nationally. This design, termed a tandem or redundant control system, protected against the recycling of the ram in the event of a failure in one limit switch. The second switch would respond in the event of such a failure and would maintain the control and not recycle and it also contained a means of stopping the press even if both limit switches failed.

In response to a hypothetical question, Scheiblauer stated the design of the press in question was unsatisfactory because the press depended on a single limit switch on every stroke to operate correctly. This limit switch was subject to wear and would eventually fail and in its usage, "it was virtually assured that the press would one day continue to recycle, and the only unanswered question would be when."

Dr. Ralph Armington, an electrical engineer, stated the circuitry of the machine was "not of such a nature as to be fail-safe" in that it depended on the proper operation of a single switch, that the electrical circuitry for presses could be designed to provide for "fail-safe" operation by the use of two switches, or the circuitry could have been wired in the open rather than the closed position so that if the switch actuator mechanism failed, the press would stop rather than continue to run. These and other fail-safe systems were available prior to 1965.

Fred Eiseman, the president of Revere, testified that in 1964 and 1965, Revere sold 1000 to 1500 Honeywell limit switches annually. These switches become defective and fail, and for that reason Revere sells replacements to various organizations, including Werner. Eiseman also stated that with an open, as opposed to closed, circuitry, the machine would stop if the limit switch did not function.

Service raises eight issues on its appeal against the plaintiff. They are: (1) the trial court improperly directed a verdict in favor of Honeywell and Revere thereby improperly removing their defense of a defective limit switch; (2) plaintiff counsel's voir dire examination was prejudicial; (3) the improper denial of a motion *in limine* to preclude reference to inapplicable warranties; (4) the improper admission of portions of Web's

counterclaim; (5) improper remarks of the trial judge; (6) improper conduct of plaintiff's counsel in closing argument; (7) improper conduct by the jury; and (8) the verdict was excessive. Web adopted all eight errors alleged by Service and added also the refusal of the trial judge to admit a catalogue in evidence.

Service first claims that its primary theory of defense to the plaintiff's suit was that the proximate cause of her injuries was not any claimed deficiencies in the design of the press, but rather the defective limit switch. This contention leads from the exclusion of evidence of the alleged defective nature of the switch for the reason that there was a failure of evidence to connect the switch examined by experts to the switch which was taken from the press after the occurrence. It appears the switch was removed from the press by Peters shortly after the occurrence and was examined by both Peters and Werner. Werner stated he then placed the switch in his desk and on March 7, 1967, gave it to Thomas Walker, an investigator for Werner's insurer. Walker denied ever having possession of the switch and denied ever giving the switch to the expert, Ralph Armington. Armington claimed to have "acquired" a broken Honeywell microswitch from Walker of which he and then his colleague, Dr. Paul Gordon, made tests demonstrating the defective nature of the switch they examined.

Plaintiff answers this issue with the argument that any claimed error in these rulings could only have prejudiced her and not Service and Web. We agree. We are at a loss to perceive how this alleged error could have prejudiced Service and Web. The theory of the plaintiff against Service and Web from the onset of the trial was based on strict liability in that Service designed, manufactured and sold a machine through Web, which was defective or unreasonably dangerous when the press left its possession or control. The so-called "issues" instruction makes this clear in that in order to recover against Service and Web, plaintiff was required to prove the electrical circuitry in the punch press was so designed as to continue the operation of the press or single cycle operation in the event of a failure of one limit switch and this defective or unreasonably dangerous design was a proximate cause of the plaintiff's injury. By its verdict, the jury must be assumed to have affirmed each element of plaintiff's burden in this regard.

Neither Service nor Web contest the evidence supporting the verdict against them. Indeed, the evidence is overwhelming and presents a classic example of a calloused disregard of the safety of people who must necessarily work in close proximity to this punch press. Totally apart from the lack of expertise in William Heim's background in the design

of electrical circuitries for these sophisticated machines, both of the Service's officers stated that long prior to the manufacture of this press they actually knew of the dangerous propensities in the utilization of a single-limit switch system, and they knew that in the event of a failure of the limit switch, for whatever reason, a person's hand could be caught by the recycling ram. Service's own literature to their customers in 1963 indicated such knowledge in stating that if the press fails to stop it would be the result of a defective limit switch. Consequently this is not a case where foreseeability of the subsequent harm to the plaintiff was an issue. The officers of Service actually foresaw the possible harm and did nothing. The evidence of simple alternative designs which would have eliminated the danger were not only in the state of the art, but were actually known to Heim long prior to the manufacture and sale of this press and long prior to the occurrence here, and Service did nothing.

Therefore, the suggested authority cited by Service that intervening negligence or misconduct of a third person disrupts the causel relationship is totally inapplicable to the facts here. *Watson v. Byerly Aviation, Inc.,* 7 Ill.App.3d 662; *Vlahovich v. Betts Machine Co.,* 101 Ill.App.2d 123, *aff'd,* 45 Ill.2d 506; *Lewis v. Stran-Steel Corporation,* 6 Ill.App.3d 142; *Willeford v. Mayrath Company,* 7 Ill.App.3d 357; *Schipper v. Levitt & Sons, Inc.,* 44 N.J. 70, 207 A.2d 314; *Skalon v. Manning, Maxwell and Moore, Inc.,* 127 Ill.App.2d 145; *Smith v. Hobart Manufacturing Co.,* 302 F.2d 570 (3d Cir. 1962).

Service's reliance on section 402A of the Restatement of Torts, Second, is also misplaced. Comment "g" of that section states that a seller "is not liable when he delivers the product in a safe condition" and subsequent causes make it harmful. It is virtually undisputed that this press was unsafe and harmful at delivery because of its design irrespective of any defective component part. In the words of expert Eugene Scheiblauer, "[I]t was virtually assured that the press would one day continue to recycle, and the only unanswered question would be when."

■■ The issue of proximate cause is pre-eminently one for the jury and their determination settles the question given an evidentiary basis therefore notwithstanding the presence of other possible causes. *Neering v. Illinois Central R.R. Co.,* 383 Ill. 366; *Ney v. Yellow Cab Co.,* 2 Ill.2d 74; Prosser, Law of Torts, sec. 44, pp. 272, 274 (4th ed.); 2 Harper and James, Law of Torts, sec. 20.5, pp. 1143-1145.

In order to accept Service and Web's theory here we would have to believe that the alleged defective limit switch was the sole proximate cause of the occurrence, a conclusion which we cannot accept in view of the overwhelming evidence of the inherent defective design of this

press. We note that counsel for Service and Web advanced this theory of sole proximate cause in argument to the jury which rejected it. From our examination of the record we reject it also.

We note also that Web, Service, Honeywell and Revere were sued by plaintiff as joint-tortfeasors. Therefore, the liability of Web and Service is in no way contingent upon the liability of Honeywell and Revere. As indicated in *Wright v. Royse*, 43 Ill.App.2d 267, 281 (referring to *Chmielewski v. Marich*, 2 Ill.2d 568):

> "[T]he Supreme Court pointed out that in joint suits against joint tortfeasors, it had been clearly established in Illinois that: * * * (4) in an action against joint tortfeasors, the court may direct a verdict in favor of one tortfeasor and let the case against the other go to the jury, which may thereupon return a verdict against the other tortfeasor; and (5) if a verdict is returned against two joint tortfeasors, the court may grant a new trial as to one of them only."

We see no error, and certainly no prejudicial error, as to Service and Web in the rulings of the trial court on plaintiff's case against Honeywell and Revere, or for that matter, in the rulings on the attempt of Service and Web to prove that there may have been other causes to this tragic occurrence.

■■ Service and Web next raises as error the conduct of plaintiff's counsel in the voir dire. It is alleged that the jury was conditioned to return an award of "very substantial damages." We have reviewed the entire voir dire, not only those selected segments advanced by Service and Web. We find no error whatever in the conduct of the voir dire. It was relatively short, covering only 400 pages of the record, with 35 prospective jurors interrogated by 5 experienced trial lawyers. Each of the jurors was examined carefully by the trial judge himself who elicited from each the sworn commitment to be fair, impartial and objective to all parties, to follow the instructions of the court even if he or she did not agree with them, and to be free from any bias, prejudice and sympathy for or against any party. The examination of plaintiff's counsel was always couched in terms of proof of liability against one or more defendants; he never once mentioned a specific figure, but only inquired whether a juror would be reluctant to return a verdict for substantial or very substantial damages in the event liability were established. In our judgment the trial court did not abuse his discretion in the conduct of the voir dire (*Haymes v. Catholic Bishop of Chicago*, 41 Ill.2d 336), and the examination of plaintiff's counsel was certainly within the aegis of *Murphy v. Lindahl*, 24 Ill.App.2d 461; *Scully v. Otis Elevator Co.*,

2 Ill.App.3d 185; and *Jines v. Greyhound Corp.*, 46 Ill.App.2d 364, *reversed on other grounds*, 33 Ill.2d 83.

Service next alleges error in the improper denial of its motion *in limine* to preclude reference to certain warranties in its catalogue relative to "fool proof" safety features. Apparently Web did not join in this motion and cannot now claim error in its denial. Service raises two grounds for the propriety of the motion: (1) the catalogue quoted in support of plaintiff's claim that Service had made such express warranty was printed after the sale of the press, and (2) the warranty pertained to "transistorized controls," an optional feature that was not ordered by Werner. The evidence relative to the express warranty, particularly the date of order and delivery of the press, is confused at best. At the inception of the trial, counsel for Web and Service insisted that the press had been sold and delivered to Werner in 1965 and had been operated without incident for 2 years. However, according to Robert Werner, vice-president of Werner, the Werner plant did not begin operation until December 27, 1965, and the press was ordered in June of 1966 from Web. Werner further stated that in ordering the press from Web he utilized a Service catalogue, delivered by another Service distributor, Ward Machinery, and order a press "with a two-hand plug-in control which is identified on page 5 of the Service * * * catalogue as a fool proof safety." Werner stated that the control was not delivered initially, but after his call to Web and Service, the "two-button hand control for foolproof safety" was delivered and installed on the press in October of 1966. From the foregoing it is apparent that Werner actually ordered what he considered to be a "fool-proof" safety control, but did not order the transistorized electronic press control which was optional. We believe his mistake, if it was a mistake, led from the wording on page 5 of Service's catalogue which is at best unclear in limiting the characterization of a "fool-proof" safety control to the optional transistorized control. It is also important to note that William Heim admitted the "fail-safe" advertisement of Service, and Robert Janis stated that "fool-proof is practically the same as fail-safe."

An express warranty under the Uniform Commercial Code is any "affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain * * *." (Ill. Rev. Stat. 1967, ch. 26, ¶ 2—313.) Under even a strict interpretation of the statute, as applied to this record, the plaintiff had a viable theory of a breach of express warranty. The press was advertised to be fail-safe, Werner ordered a fool-proof control, and by even the testimony

of Service's own officers, the press was neither fail-safe nor fool-proof, it those words have separate meaning.

■■ We note also that plaintiff elected not to proceed on the express warranty theory. Therefore, even if the denial of the motion *in limine* can be termed error, and we believe it was not error, there could have been no prejudice to Service and Web.

Service raises as its next claimed error the reading of certain portions of Web's counterclaim against Service in plaintiff's case against Web. In its counterclaim, Web stated that plaintiff's injuries were caused by and the result of the negligence of Service in designing, manufacturing, distributing and selling the press and that Service's negligence was "primary, active and affirmative in character." It appears that prior to offering this evidence, plaintiff's counsel informed the court and Web's counsel out of the jury's presence of his intentions. Web did not object and agreed with the procedure to be followed. The evidence was admitted solely as to Web on the theory that it constituted an admission by Web, that is, an admission the press was in fact defectively or negligently designed at the time it passed through Web's hands, and Web, as a party in the chain of distribution, was therefore strictly liable. *Dunham v. Vaughan & Bushnell Mfg. Co.*, 42 Ill.2d 339.

Not having objected at the time of trial, Web cannot raise the question here on appeal. Service believes, however, the trial court's instruction to the jury that the evidence was not binding on Service was prejudicial in that the jury might still believe the Web pleadings were evidence against Service. We believe the instruction was proper and of sufficient clarity to properly inform the jury.

■■ Where statements in pleadings are not expressed in the alternative and state facts which are adverse to the interests of the pleader, they are proper evidence by an adversary in the instant or subsequent cases concerning the same subject matter even if the parties are not the same. (*O'Brien v. Brown*, 403 Ill. 183; *Bassi v. Morgan*, 60 Ill.App.2d 1.) The distinction between a judicial and evidentiary admission in pleadings is carefully analyzed in *Precision Extrusions, Inc. v. Stewart*, 36 Ill.App.2d 30. These pleadings fall precisely within the judicial admission category outlined in *Precision Extrusions* because they were neither amended nor withdrawn by Web prior to their being offered. However, it appears the trial judge considered them evidentiary admissions and later in the trial the pleadings were amended.

■■ We can find no error as to Service in their admission against Web and certainly no error as to Web because Web did not object.

Service and Web also contend the trial court displayed overt hostility toward their attorneys, setting out four alleged instances of such hostility.

We find absolutely no merit to this contention. We note the trial of this case lasted almost 6 weeks. It involved, for the most part, five experienced, able and aggressive members of the trial bar together with another trial lawyer, who audited the trial for Werner (whose third-party action was severed) but actively participated in the arguments out of the presence of the jury. In reviewing the record we marvel at the control the trial judge manifested in the proceedings. The alleged erroneous statements raised by counsel for Service and Web were brought about in great measure by their own actions, including a request before the jury for a contempt citation to issue against Werner's counsel for failing to respond to a subpoena served 1½ hours prior when this attorney was waiting in the trial judge's chambers. There is no evidence of hostility on the part of the trial judge, no erroneous comment, and certainly no clear showing of prejudice from any comment which would amount to a reversible error. *Johnson v. Cunningham,* 104 Ill.App.2d 406.

Service and Web raise as error certain alleged erroneous remarks by plaintiff's counsel in argument. In the first remark, plaintiff's counsel informed the jury that every witness testified as part of plaintiff's case and no witnesses testified as a part of either of the defendant's cases. Service claims error in that no one testified for the defendants because of the trial court's ruling on the failure to establish the chain of possession of the microswitch. However, there were other issues of substance in plaintiff's case completely divorced from the issue raised with the limit switch, such as the propriety of the design of the press, the state of the art, the damages claimed by plaintiff, and so forth.

■■ The next remark complained of concerns a statement by plaintiff's counsel to the jury that the trial judge dismissed Honeywell and Revere because he decided they had no legal liability. Service's counsel immediately objected stating the court "merely remarked that they were no longer in this lawsuit." Counsel for Web requested a mistrial. Counsel for plaintiff then withdrew the remark and counsel for Service requested a mistrial. The trial court then stated, in agreement with Service's counsel: "I informed the jury they were no longer defendants in this case." Counsel for plaintiff again withdrew the remark, asked to clarify it, and apologized for saying it. The trial court then denied the motions for mistrial, and plaintiff's counsel explained to the jury he had made a mistake, that Honeywell and Revere were no longer parties and again apologized. Whatever impropriety there may have been in the statement initially was removed by action of the trial court and plaintiff's counsel. There was no prejudicial error in the remark.

The next remark concerned plaintiff counsel's preliminary statements to argument relative to Web's admissions in its counterclaim against

Service. Plaintiff counsel attempted to explain that parties can counter-sue and cross-sue. There was no prejudicial error in the remark.

The last remark concerned a statement by plaintiff's counsel that the jury listen to the instruction on damages because there may be comments which may not follow the instruction. This remark was not an attempt to embarrass, belittle or abuse defense counsel, but was more in the vein of exhorting the jury to disregard statements not in conformity with the record or the instructions of the court. Similar statements were made by the court and other counsel throughout the trial.

■■ The character and scope of trial counsels' argument to the jury is traditionally a matter addressed largely to the discretion of the trial judge, and such remarks of counsel will not create reversible error unless the trial court abuses the discretion vested in him to keep the argument within appropriate bounds. (*Gatto v. Curtis*, 6 Ill.App.3d 714.) This was a long, technically complex case. Under these circumstances we believe the trial court had the best opportunity of determining the effect of the alleged improprieties. All the remarks were alleged as reversible error in the post-trial motions. The trial court concluded the trial was fair and the verdict was proper. Under these circumstances we cannot find a clear abuse of discretion by the trial court. *Johnson v. Cunningham*, 104 Ill.App.2d 406.

Service also raises alleged improper conduct of the jury as reversible error. Following the reading of instructions and while the jury was retiring to the jury room to deliberate, one juror inquired of the court whether they were allowed to say the money should be put in a trust. The trial court immediately admonished the juror that the jury was to put down whatever their verdict was and that was it. Service suggests this statement indicates the verdict was not arrived at through deliberation. We disagree. The statement of the juror was susceptible of several interpretations. The juror could have been seeking further information about the instruction on damages which is always couched with the requirement of an initial finding of liability. Even if he or she chose not to deliberate, there is no indication the other eleven adopted the same attitude. This was not error.

Web claims error in the refusal of the trial court to admit the Service catalogue used by Werner to order the press. It was sent to Werner by Ward Machinery Company. Web takes the position the Service catalogue contained express warranties by Ward and not Web. It is difficult to discern how Web finds error in this ruling. Robert Werner stated the Service catalogue, one of 50,000 distributed to consumers, had been forwarded to him and he used page 5 of the catalogue to order the "fool-proof" control system from Web. Web does not complain of this

testimony. The actual catalogue added nothing whatever to Werner's testimony which was admitted without any objection. Nor does Web contend the Service catalogue of Ward, utilized by Werner, was in any way different from the Service catalogues used by Web. The court's ruling was not error and was certainly not prejudicial.

Finally, Service and Web claim the damages are excessive. The defendants agree plaintiff was seriously injured to the extent she has permanent and complete functional loss of use of both hands, that she will require care, and is unemployable. The evidence of plaintiff's injuries was not rebutted by any evidence offered by the defendants. Three qualified orthopedic surgeons agree plaintiff's hands are deformed, useless and permanently painful, and that she needs care every day in order to do things she is required to do in ordinary life. Two qualified managers of nurse registries testified the cost of a companion nurse in the Chicago area is from $22 to $24 a day for 8 hours. Plaintiff's accrued loss of income at the time of trial was $25,000 and she would have been earning at least $7,800 per year for the rest of her working life. Her life expectancy at the time of the trial was 35.2 years, and she had borne her injuries for 5½ years from the date of the occurrence to the time of trial.

Plaintiff explained her daily problems in her testimony. She has continual pain in her hands for which she soaks the hands in hot water and takes pills. She cannot eat, dress, or wash herself; she cannot brush her hair or teeth, open a door, write, or even cook a meal.

In argument, plaintiff's counsel noted the cost of caretaking alone, for this woman's life expectancy of 35 years, would have totalled $560,-000. Her future lost income for a projected 28-year working life expectancy would have been $218,400. Her lost income to the date of the trial and medical expenses totalled over $30,000. Included also are the other proper elements of damages, such as the nature and extent of these gross injuries, plaintiff's substantial disability and the obvious disfigurement of her hands, the pain and suffering she is to endure for the rest of her life. The jury could have considered these latter elements as the most substantial of her damages. They also were not limited to a 35-year life expectancy.

Defendant's principal contention appears to concern the alleged failure of the jury to reduce the elements of future caretaking expenses and loss of income to present cash value. No actuarial evidence was presented by any party, nor was there evidence of inflationary trends. Accordingly, we believe the statement of the court in *Scully v. Otis Elevator Co.*, 2 Ill.App.3d 185, is controlling:

> "We similarly find no pertinency in the issue as to present

value and its method of calculation, since the jury was properly instructed and the parties take no issue with the instruction."

Without clear evidence to the contrary, we cannot indulge in the presumption that the jury did not follow the instruction of the trial court. *Hall v. Chicago & North Western Ry. Co.*, 5 Ill.2d 135; *Hedge v. Midwest Contractors Equipment Co.*, 53 Ill.App.2d 365.

■■ Ultimately, the question presented here is seen in hundreds of cases each year, that is, whether reasonable men· might differ in their answers to the question of the damages (*Smelcer v. Sanders*, 39 Ill. App.2d 164), or whether the total amount of the verdict falls within the necessarily flexible limits of fair and reasonable compensation or is so large as to shock the judicial conscience. (*Barango v. E. L. Hedstrom Coal Co.*, 12 Ill.App.2d 118.) We cannot say the size of the verdict is the result of prejudice or passion on the part of the jury. *Ford v. Friel*, 330 Ill.App. 136; *Scully v. Otis Elevator Co.*, 2 Ill.App.3d 185.

## II.

The second appeal in this cause is plaintiff's appeal against Honeywell and Revere from the judgment entered on a directed verdict in favor of Honeywell and Revere. The pertinent facts underlying plaintiff's case centered on the installation of a new Honeywell switch on the press the day before the accident, and the subsequent examination of the limit switch after the occurrence. It is undisputed the limit switch was found to have a broken actuator arm, that after the occurrence a switch with a broken actuator arm was examined by two experts some time after the occurrence, and that one expert testified in an offer of proof to the effect that the switch was defectively manufactured. The trial court excluded this testimony for the reason that an insufficient foundation for the switch had been laid, in that the chain of possession of the switch, subsequent to the occurrence, had been broken. This ruling led to the trial court's decision to direct a verdict in favor of both Honeywell and Revere at the end of plaintiff's case.

We agree with that decision. It appears from the testimony that Peters removed the limit switch on March 1, 1967, and gave it to Werner, who testified on his voir dire examination that it was not identified by any marking or other identifying symbol. Werner stated he kept the switch in his desk and then gave the switch to Walker on March 7, 1967. One of the experts, Dr. Armington, stated he examined a broken switch he "acquired" at the Werner plant; however, he could not recall that Walker handed him the switch but "in all probability that he (Walker) handed the switch to me." This was not his recollection but was merely his interpretation of the record.

Walker was positive in his testimony (1) he did not deliver the broken limit switch to Dr. Armington; (2) he never had possession of that limit switch; and (3) it was never given to him by anybody.

Werner testified he did not deliver the broken limit switch to Dr. Armington, nor did he recall that he ever saw Dr. Armington in possession of any switch. Neither Werner nor Peters saw Walker give a limit switch to Armington; neither was able to say the limit switch examined by Dr. Armington and Gordon was the same one removed from the press after the accident.

■■ It is our opinion, after a careful review of the record, the proof failed to establish that a limit switch examined by the two experts was the limit switch on the press at the time of the injury to he plainiff.

## III.

The third appeal in this cause involves the dismissal of Web's third-party complaint against Werner, plaintiff's employer, and the dismissal of its counterclaims against Honeywell and Revere. Web's theory for its action over is a common law indemnity, one not grounded on contract Web, of course, is charged with whatever manufacturing defects existed in the press, whether of design or otherwise, and in view of the jury's verdict against it, these charges were accepted by the jury. Furthermore, from the testimony in this case of the grossly dangerous design of the press of which Service was fully aware, it would seem that the jury could have followed no other course. Service's officers actually knew of the danger and the inevitability of injury when the press was manufactured. A number of witnesses testified that limit switches failed for a variety of reasons and about 1500 such switches were sold annually by Revere as replacements. Furthermore, Robert Werner testified he ordered a "fool-proof" control system from Web, and the evidence showed that Werner did not receive such a system. We fail to discern how either Service or Web can be said to have been passively negligent. The jury's verdict states that the press was unreasonably dangerous or defective when it left the possession or control of Service and Web (that is *before* the installation of the Honeywell switch), and that this condition was a proximate cause of the plaintiff's injuries.

■■ On the facts in this case, we believe there can be no common law indemnity to Web other than its successful action against Service. We reach this conclusion separately from the decisions in *Burke v. Sky Climber, Inc.*, 13 Ill.App.3d 498; *Kossifos v. The Louden Machinery Co.* (First District), No. 56647, filed February 13, 1974; and *Stanfield v. Medalist Industries*, 17 Ill.App.3d 996, although we agree with the concept in these decisions that the ultimate liability resulting from a judg-

ment determining that a product is defective or unreasonably dangerous should rest with the manufacturer and distributor of the product, who reaps the profits from its manufacture and sale. We note that *Burke, Kossifos* and *Stanfield* were decided on the pleadings, whereas the instant case comes on appeal from a jury verdict finding both Service and Web strictly liable for the manufacture and sale of an unreasonably dangerous press.

We reject the theory of Web that Honeywell, Revere and Werner were assemblers or subsequently altered the machine by the installation of the switch. It is undisputed that the Honeywell and Licon switches were used interchangeably. The liability imposed upon Service and Web had literally nothing to do with the installation of the switch.

Finally, we can perceive of no possibility of any damage to Web as a result of plaintiff's judgment inasmuch as Web has judgment on its cross-claim against Service, from which no appeal has been taken. Service has secured plaintiff's judgment with an appeal bond in an amount sufficient to pay plaintiff's judgment, therefore there is nothing for Web to be indemnified against.

For the reasons stated, all the judgments and orders entered herein are affirmed.

Affirmed.

ADESKO, P. J., and JOHNSON, J., concur.