CARL A. CARLSON, Plaintiff-Appellee, *v.* DORSEY TRAILERS, INC., *et al.*, Defendants-Appellants.

First District (4th Division) No. 62933

Opinion filed July 7, 1977.

Wildman, Harrold, Allen & Dixon, of Chicago (Richard C. Bartelt and Robert E. Kehoe, Jr., of counsel), for appellants.

Robert D. McHugh, of Barish, McHugh & Dod, of Chicago, for appellee.

Mr. JUSTICE JOHNSON delivered the opinion of the court:

The plaintiff, Carl A. Carlson, brought this action in the circuit court of Cook County, Illinois, seeking to be compensated for injuries he sustained as a result of defendants' alleged negligence in a highway collision. At the conclusion of all the evidence, the court directed a verdict in favor of the plaintiff on the issue of liability. The jury returned a verdict of $600,000 in damages and judgment was entered accordingly. Defendants appeal from the judgment entered.

The issues presented for review are (1) whether the trial court acted appropriately in directing a verdict in plaintiff's favor on the issue of liability; and (2) whether the verdict of $600,000 in damages for plaintiff's injuries is excessive.

The record reveals that the accident happened at approximately 8:20 a.m., on January 22, 1973, on Highway 125, west of Springfield, Illinois. The collision occurred at the Farmingdale Road "T" intersection between two tractor-trailers, one driven by the plaintiff, the other by defendants' driver, Truman Norris. The complaint alleged that the defendants, through their agent and driver, were negligent in the operation of their vehicle and proximately caused severe injuries to the plaintiff.

The plaintiff testified that he was an experienced tractor-trailer truck driver and employed in that capacity by Dry Ice, Inc. On the morning of the accident, he was driving a "1972 Ford cab-over" trailer truck. He had awakened at 7 a.m. in order to make a delivery in Beardstown, Illinois. Plaintiff then traveled Route 125 on his way to Springfield for his next delivery. He had driven Route 125 before and was familiar with the

highway. Around the area of the accident, Route 125 was a two-lane road, straight highway, with two yellow lines in the center and white lines on each side of the road. The highway runs east-west, and is intersected by Farmingdale Road, which runs to the south. He stated, "There is no road going off to the north. There is no buildings. It's fairly well open." According to the plaintiff, there is a quarter of a mile of highway straightaway that continues in both directions from Farmingdale Road. Beyond the straightaway section, east of the intersection, there is a hill, or crest, in the highway. There is a stop sign at the intersection controlling Farmingdale Road traffic.

Plaintiff testified that he was proceeding eastward that morning with all of his headlights, running lights, fog lights and trailer lights on. His cab radio was turned off and his seat belts were fastened. It had been raining earlier and the highway was wet, but it was not raining at the time of the accident. Visibility was good. Plaintiff was driving at approximately 50 miles per hour. There were no vehicles immediately ahead of him in the eastbound lane, and nothing obscured his vision. As he came into the straightaway nearing the Farmingdale Road intersection, he became aware of westbound traffic. He observed an automobile, driven by John Fleischacker, coming westbound, followed by the truck leased by defendant, Dorsey Trailers, Inc. The Fleischacker car signaled for a left turn approximately "200 yards, or 200 feet" from the intersection; the Dorsey truck still followed at a reasonable distance behind the car. At that time, the plaintiff also noticed a school bus coming down Farmingdale Road. The bus reached the "T" intersection, stopped, and signaled a left turn. The car then began to reduce its speed, came to a stop in the westbound lane on the east side of the intersection, and prepared to make a left turn onto Farmingdale Road. Plaintiff saw the Dorsey truck "closing in" on the stopped car. He explained that he had reduced his speed when he had observed Fleischacker signal a left turn, because "sometimes they will turn in front of you." Plaintiff testified that he was in his own eastbound lane watching the car and oncoming truck, and that at no time did he leave his lane. He had reached the intersection when he observed that the Dorsey truck was immediately behind the car. The truck then "came out" from behind the car and passed. Since he believed that the Dorsey driver was attempting to gain more space in which to stop, plaintiff pulled his truck as far to the right of the eastbound lane as he was able to. He stated that he did not turn off Route 125 onto Farmingdale Road to avoid the accident because he could not have done so without hitting the school bus. The plaintiff proceeded through the intersection, the right side of his truck passing 4 feet in front of the school bus. The collision took place on the side of the intersection east of Farmingdale Road. Plaintiff testified that when he reached that side of the intersection,

the Dorsey truck was in the eastbound lane and continued towards him until the left front corner of the Dorsey truck collided with the left front corner and side of plaintiff's truck.

Plaintiff testified that both he and Norris were later taken to St. John's Hospital in an ambulance. He stated, "I asked him if he didn't see me and he said no. He was playing with his radio."

Paul Orr, a State Police Trooper, testified that he works in the Springfield area and that he was called to the scene of the accident at approximately 8:22 that morning. He stated that the highway was wet, but visibility was clear and it was not raining. However, the trooper stated that when he questioned Mr. Norris, Norris told him that he "* * * didn't see either of the vehicles. He didn't notice that they were going to do what they done." Trooper Orr's description of the accident scene substantially corroborates plaintiff's description. Orr stated that there was a low spot in a section of the highway near Farmingdale Road. According to Orr, a car in that low spot would be visible to the driver of a vehicle coming from the east towards Farmingdale Road, although it might not be visible to the driver of an eastbound vehicle.

Charles Ziemer, a resident of Bloomington, Illinois, and a school psychologist, testified that on the morning of the accident he was traveling west on Route 125. He was driving a Buick automobile and came up behind the Dorsey truck 4 or 5 miles from the intersection. Ziemer stated that from the top of the crest in the highway he could see straight down the road and noticed oncoming traffic in the eastbound lane. While following the Dorsey truck from the crest down toward the intersection, he did not see the truck reduce its speed. He never saw the truck's brake lights go on. He did see the truck accelerate slightly and move across the center line into the eastbound lane. The next thing he observed was flying debris.

John Fleischacker testified that visibility was fine that morning as he was driving west toward Farmingdale Road. He put his left turn signal on 200 feet from the intersection. At this time, the Dorsey truck was approximately 2 blocks behind him. As he waited to make his turn, Fleischacker looked back and observed that the truck was now only 50 feet behind him. He did not believe that the truck was going to stop because its speed was too great. The truck then appeared to cross the yellow line and move into the eastbound lane. Fleischacker was hit by the Dorsey truck and knocked 25 feet from the highway. He then heard an explosion and realized that the two trucks had collided. According to Flesichacker, Norris admitted that he had not seen the stopped automobile because he was playing with his radio.

Harold Barfield related that he was driving a yellow school bus north along Farmingdale Road. He reached Route 125 and was within 10 feet of

the highway when he witnessed the accident. He testified that the Fleischacker car had stopped and was waiting to make a left turn. The westbound Dorsey truck then pulled out into the eastbound lane to go around the turning automobile. The cab of the truck started across the eastbound lane in the direction of the school bus. Barfield attempted to shift the bus into reverse but did not have sufficient time to do so. The plaintiff's truck then passed in front of him and the two trucks collided.

Truman Norris testified that on the morning of the accident he was driving a tractor-trailer owned by defendant Wilco Leasing Company; he was an employee of defendant Dorsey Trailer Company. He was driving a 1973 Ford cab-over trailer truck. The vehicle had a radio located on the right side of the gear shift. He stated that in the cab he was sitting at least 6 feet above the road, much higher than an automobile. He had never driven Route 125 prior to the day of the accident, and was not aware that there was an intersection at Farmingdale Road.

Norris stated that the weather was wet and misty. He did not remember the exact character of the highway at the accident scene; whether it was a straightaway or a no-passing zone. He was traveling approximately 40 or 45 miles per hour and could not remember any traffic traveling ahead of him in the westbound lane. He did remember being followed along the highway by a Buick automobile. Norris stated that he was driving and looking ahead, but did not see the Fleischacker car in front of him. He reached over to turn on his radio. Norris could not remember whether or not he had taken his eyes from the road while adjusting the radio. He then looked up and noticed the Fleischacker car for the first time. He did not notice the school bus or plaintiff's oncoming truck in the eastbound lane. Norris hit his airbrakes. He did not remember hitting the car, but only that his trailer "jackknifed" to the left into the eastbound lane of traffic. He could not remember any impact with plaintiff's truck because he had blacked out. Norris next recalled awakening on the pavement of the road. He did not remember talking to any person other than Trooper Orr about the accident. He did not recall what he had told Trooper Orr.

The defendants argue on appeal that the trial court erred in directing a verdict in plaintiff's favor on the issue of liability; that it erroneously applied the standard for directed verdicts established by our supreme court in *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504. That case held:

> "In our judgment verdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on

that evidence could ever stand." (37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14.)

According to defendants, the trial court failed to appreciate that the trier of fact has both a fact-finding and a conduct-evaluation function. The defendants contend that this dual function is particularly vital in a negligence case, where, although the evidence may be conclusive as to the facts, reasonable men could differ as to whether the defendants' conduct was negligent under the circumstances. Defendants argue that even if the circumstances of the accident were conclusively proved, there was sufficient doubt as to whether Norris' conduct was negligent and, thus, the issue of liability should have been decided by the jury. The defendants point out that no evidence was introduced regarding the quality of plaintiff's conduct, and that the conduct of both the plaintiff and the defendant should be evaluated in a negligence case. *Wolfe v. Whipple* (1969), 112 Ill. App. 2d 255, 251 N.E.2d 77, is cited as authority for this contention. The defendants further contend that despite the testimony of the witnesses, the evidence was too uncertain and conflicting to allow a directed verdict. They insist that the plaintiff's case was based on inference and, therefore, the court erred in concluding that Norris was negligent as a matter of law.

■■ The standard for directing a verdict established in *Pedrick* is the same standard to be applied by a reviewing court in determining whether or not a trial court has erroneously directed a verdict. (*Campbell v. Cowden* (1974), 18 Ill. App. 3d 500, 502, 309 N.E.2d 601, 603.)

"In reviewing the propriety of a verdict directed for a [plaintiff], in order to determine if the evidence so overwhelmingly favored the [plaintiff] that no contrary verdict could ever stand, a reviewing court will '* * * look at the evidence as it appears most favorably to the [defendants], together with all reasonable inferences construed most strongly in their favor, rejecting all contrary or explanatory circumstances.' *Weiner v. Trasatti* (1974), 19 Ill. App. 3d 240, 242, 311 N.E.2d 313." *Public Taxi Service, Inc. v. Barrett* (1976), 44 Ill. App. 3d 452, 455, 357 N.E.2d 1232, 1236.

■■ We agree that the trial court herein, acting as trier of fact, had the duty to evaluate the conduct of the defendants' driver (*Roth v. Nauman* (1967), 90 Ill. App. 2d 44, 49, 234 N.E.2d 346, 349), and to determine if that conduct was the proximate cause of plaintiff's injuries. (*Public Taxi*, at 456.) In negligence cases, the issue of liability should be resolved as a question of law and a verdict directed only when the facts are such that there could be no difference in the judgment of reasonable men as to the inferences to be drawn from the facts. (*Public Taxi*, at 456; *Casey v. Burns* (1955), 7 Ill. App. 2d 316, 326, 129 N.E.2d 440, 445.) In reviewing the

facts and circumstances established by the evidence in the instant case, we find that the judgment of reasonable men could not differ as to the inferences to be drawn from those facts. The trial court correctly applied the *Pedrick* standard when it directed a verdict in plaintiff's favor. The evidence, when viewed in its aspect most favorable to defendants, is such that no contrary verdict based on that evidence could stand.

■■ The testimony of the driver, Truman Norris, is of questionable probative value. He could neither recall the details of the accident scene nor remember seeing the traffic that was traveling directly ahead of him in the westbound lane of the highway. He failed to observe oncoming traffic in the eastbound lane. However, Charles Ziemer testified that traveling westbound from the crest in the highway down toward the intersection he could see straight down the road, including eastbound traffic. Norris admits that just prior to the collision he turned to adjust his radio; he did not remember whether or not his eyes left the road. He also testified that he "looked up" prior to the accident and viewed the Fleischacker car for the first time. Norris stated that he was "driving and looking ahead" but failed to see the car. However, the law refuses to recognize that a person can looked directly at an object and not see it, where his view is not obstructed. (*Monken v. Baltimore & Ohio R.R. Co.* (1950), 342 Ill. App. 1, 6, 95 N.E.2d 130, 132.) Several of the witnesses testified that Norris admitted on more than one occasion that he did not see the Fleischacker car because he was playing with his radio.

The defendants point to the testimony of Trooper Orr to the effect that a low spot existed in the road. They argue that if the Fleischacker car had settled in that lowspot it may not have been visible to Norris. However, the trooper also testified that a vehicle in the low spot would clearly be visible to the drivers of vehicles following it in the westbound lane. He stated that drivers of eastbound vehicles might not have a clear view of the car. However, the plaintiff testified that he had a clear view of the turning car from the eastbound lane. Norris testified that he was sitting high on the road, much higher than the drivers of automobiles. Under these circumstances, the trial court properly concluded that even if the car was resting in the low spot it could not disappear entirely from the view of Norris.

The trial court properly distinguished *Wolfe v. Whipple* (1969), 112 Ill. App. 2d 255, 251 N.E.2d 77, on the facts, from the instant case. In *Wolfe*, the defendant skidded across the center line of a highway, allegedly because of a situation created by the plaintiff. The appellate court found that the trial court had erroneously directed a verdict for the plaintiff where there was strong evidence of contributory negligence. Here, there was no such evidence. The testimony of plaintiff's witnesses was clear and

unwavering, and tended to establish that Norris was negligent and the plaintiff was not.

The defendants next argue that the jury verdict of $600,000 in damages for plaintiff's injuries is excessive. They request that a new trial or a remittitur of $200,000 be granted.

The law in Illinois is well established that the amount of a verdict is primarily within the province and discretion of the jury. (*Lau v. West Towns Bus Co.* (1959), 16 Ill. 2d 442, 452, 158 N.E.2d 63, 69; *Lawson v. Belt Ry. Co.* (1975), 34 Ill. App. 3d 7, 28, 339 N.E.2d 381, 398; *Wells v. Web Machinery Co.* (1974), 20 Ill. App. 3d 545, 560, 315 N.E.2d 301, 314.) The standard of review to be applied in determining whether a jury verdict is excessive was set out in *Lau*, at 453. The *Lau* court held:

> "Each verdict for a personal injury must be examined in the light of the particular injury involved, with humble deference to the discretion of the jury in making its determination and to the ruling of the trial judge on the post-trial motions. *Johnson v. Eckberg*, 94 Ill. App. 635.
>
> We are not unmindful of our obligation to carefully scrutinize the record to determine whether the amount of the verdict is so large as to indicate passion and prejudice. This we have done, and we conclude from the evidence that although the verdict may well be in excess of the amount which the judges of this court would have allowed if they had heard the evidence and made the original determination, yet we do not believe that it is so excessive as to show passion or prejudice." (*Lau v. West Towns Bus Co.* (1959), 16 Ill. 2d 442, 453, 158 N.E.2d 63, 69.)

Furthermore:

> "[R]eference to awards recovered in other cases is of doubtful relevance to the inquiry of whether the verdict in the instant case is excessive. One wrongfully injured by another should be permitted to secure a recovery based upon the evidence of his own particular loss, rather than by consultation of a schedule of previous awards." (*Lawson v. Belt Ry. Co.*, 34 Ill. App. 3d 7, 27-28, 339 N.E.2d 381, 398.)

The *Wells* court, in affirming a verdict, held that, "[w]ithout clear evidence to the contrary, we cannot indulge in the presumption that the jury did not follow the instruction of the trial court." (*Wells v. Web Machinery Co.* (1974), 20 Ill. App. 3d, 545, 560, 315 N.E.2d 301, 314.) The court noted:

> "Ultimately, the question presented here is seen in hundreds of cases each year, that is, whether reasonable men might differ in their answers to the question of the damages [citation], or whether

the total amount of the verdict falls within the necessary flexible limits of fair and reasonable compensation or is so large as to shock the judicial conscience. [Citation.] We cannot say the size of the verdict is the result of prejudice or passion on the part of the jury." 20 Ill. App. 3d 545, 560, 315 N.E.2d 301, 314.

■■ In the instant case, we do not find that the jury's verdict is a product of passion or prejudice, that it is so large as to shock the judicial conscience, or that it exceeds the limits of fair and reasonable compensation. The defendants admit that the jury was properly instructed to discount payments of future income in reaching their verdict, but contend that the jury improperly discounted the projected future payments and arrived at an excessive verdict. However, absent clear evidence to the contrary, we will not presume that the jury failed to follow the proper instruction of the trial court. (*Wells*, at 560.) The plaintiff presented evidence adequate to convince the jury of the amount of compensation due him. The record does not demonstrate that the verdict could only have been the product of passion or prejudice on the part of the jury (*Lawson*, at 28) and, therefore, the trial court acted appropriately when it denied the defendants' post-trial motion for a new trial or remittitur of $200,000.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

LINN and ROMITI, JJ., concur.