771 F.2d 224
 Prod.Liab.Rep.(CCH)P 10,654
Marilyn DAVIS, Plaintiff-Appellee,
v.
FMC CORPORATION, FOOD PROCESSING MACHINERY DIVISION,
Defendant-Third-Party Plaintiff-Appellant,
v.
JOAN OF ARC COMPANY, a corporation, Third-Party Defendant-Appellee.
 Nos. 84-1816, 84-1915.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 12, 1985.
Decided Aug. 19, 1985.
 
 James E. McCabe, McCabe, McCabe & Rader, Williamsport, Ind., Robert J. Banks, Sebat, Swanson, Banks, Lessen & Garman, Danville, Ill., for plaintiff-appellee.
 John B. Jenkins, Gunn & Hickman, Danville, Ill., for defendant-third-party plaintiff-appellant.
 Before CUMMINGS, Chief Judge, POSNER, Circuit Judge, and PECK, Senior Circuit Judge.*
 CUMMINGS, Chief Judge.
 
 
 1
 Plaintiff Marilyn Davis filed a diversity action against FMC Corporation, Food Processing Machinery Division ("FMC") for injuries she sustained from a machine FMC had manufactured and sold to her employer, Joan of Arc Company ("Joan of Arc"). FMC appeals from a $326,620 verdict against it. We affirm.
 
 
 2
 * Sixteen-year-old Marilyn Davis was operating a corn-cutting machine at Joan of Arc's Hoopeston, Illinois, canning facility on August 16, 1976, when her right hand came into contact with a chain and sprocket assembly resulting in the partial loss of four fingers. As a result of the accident, Ms. Davis, who was right-handed, has extremely diminished pinch capability (relating to activities involving the "tripod of pinch" between the thumb, index and long fingers) and markedly diminished grasping capability (relating to the ability to hold onto large objects). In practical terms this permanent disability means, first of all, that Davis' typing ability has been dramatically decreased. Prior to the amputation, the plaintiff, after two years of instruction, could type sixty-eight words per minute error-free. Since then she has been able to type only between thirty and thirty-five words per minute error-free. She can no longer take dictation, because it is painful for her to hold a pen or pencil. The evidence established that she has at various times and by various employers been denied employment, prevented from being promoted in employment, and threatened with termination, because of her severely limited dexterity. She can no longer play the piano or sew. In addition, plaintiff has great difficulty handling money, picking up large objects such as pots and pans, using knives, using a pair of scissors, buttoning her clothes, closing snaps, opening cans, putting on jewelry and tying shoelaces. Besides the great deal of pain plaintiff suffered immediately after the accident, she has continued to experience "phantom pain" where her amputated fingers previously existed.
 
 
 3
 Joan of Arc had ordered the machine the plaintiff was operating in December of 1968, and it was shipped the following May. It was a "standard" corncutter, designed for use in a bin-feed system of operation. This machine has a high rail behind which the operator stands; a low rail is opposite. The corncutter is designed to handle 120 to 150 ears of corn per minute. The operator must place the corn onto the chain conveyor, turning the ears of corn so that they enter the machine small end first. Keeping pace with the corncutter requires very quick work. The conveyor carries the corn into the machine, past the chain and sprocket assembly to the knives that strip the ear of the kernels of corn.
 
 
 4
 Belt-feed operations require an "opposite standard" corncutter, the primary difference between the two being that the placement of the high and low rails is reversed. As a result, the operator of a standard corncutter stands on the opposite side of the machine from where the operator of an opposite standard corncutter would stand, but the two operators' duties are the same. The high and low rails are removable and can be reversed in position on the machine, thus converting a standard machine into an opposite standard. The only consequence of doing so is that a five-inch guard device that FMC claims it included on its machines, part no. JS847, would not fit after the rails had been reversed. The corresponding guard device for opposite standard corncutters is part no. JS846. Part no. JS846 is identical to part no. JS847, except it is designed to fit the high-rail low-rail configuration of opposite standard machines. The guards would fit the respective machines only when they were left in their original configuration for use in bin-feed or belt-feed operations. The guards, however, were detachable, being affixed to the machine by two quarter-inch bolts, and head cap screws with washers. FMC sold its guards separately, but prior to the plaintiff's accident in August 1976 had sold only 157 standard corncutter guards. FMC also sold separately another safety device, a microswitch and brake motor that would stop the machine immediately if the operator got too close to the hazard area, but only forty-nine had been sold prior to the plaintiff's accident.
 
 
 5
 In 1973, Joan of Arc relocated the corncutter machine that injured the plaintiff to its Hoopeston plant, which operated on a belt-feed system. Consequently, the rails were reversed to convert the machine from a standard machine into an opposite standard machine. The five-inch guard device for standard machines was not on the machine when it arrived in Hoopeston, nor did the instruction and parts manual shipped with the machine show the guard as part of the equipment included with the machine. The plant manager at the Hoopeston plant, an employee for thirty-five years, could not recall ever having seen such a guard on either the standard or opposite standard corncutters.
 
 
 6
 Plaintiff called two expert witnesses to testify about the design of the machine. Both experts agreed that the corncutter was unreasonably dangerous without the five-inch guard device because it left the chain and sprocket assembly inadequately guarded. They suggested a number of devices that were feasible and within the state of the art in 1969 that would have adequately protected the assembly, including a microswitch and brake mechanism. Such a device, which FMC sold separately as an option, would have prevented the type of injury that the plaintiff received. Even if the five-inch guard that FMC claimed it had installed on the machine were in place, they agreed that the machine was still unreasonably dangerous because the guard was too short and was detachable. They believed that removal of the guard was foreseeable unless the guard were made a permanent part of the machine.
 
 
 7
 One of the experts, Dr. Allen T. McDonald, Professor of Mechanical Engineering at Purdue University, testified that offering as an option a safety device that could prevent a serious injury, when the manufacturer has the ability to put the device on the machine before it is shipped, is not an acceptable engineering practice. FMC had designed and made available to Joan of Arc as an option in March 1969 a microswitch and brake motor assembly similar to the one proposed by the plaintiff's experts that FMC considered to be safer than the five-inch guard. Joan of Arc declined to purchase the safety option.
 
 
 8
 Both experts agreed that the machine contained inadequate warnings of its inherent danger. FMC had attached a five-inch by three-inch self-adhering decal that quickly washed off the machine, which was hosed down each evening during the canning season with high-pressure hoses. FMC knew that the machines were washed down. FMC not only encouraged its customers to keep its corncutters clean but recommended that they be steamed down at the end of every canning season, a practice that would quickly destroy a self-adhering decal.
 
 
 9
 FMC called Dr. Carl Larson, of the University of Illinois, as its expert witness. Dr. Larson testified that the corncutter machine was not unreasonably dangerous because the chain and sprocket assembly was guarded by location within the machine, it was unnecessary for the operator's hands to come in contact with the chain conveyor, and the five-inch guard provided adequate protection. He admitted, however, that the guard could have been welded to the machine or made an original part of the housing. He also admitted that as early as 1944 making a guard a permanent part of the machine, or interlocking the guard to prevent the machine from being operated should the guard be removed, was good engineering practice. He agreed that an interlock on the five-inch guard would have afforded the machine's operator more protection than the five-inch guard alone. Dr. Larson conceded that a microswitch and brake motor might have prevented the accident, and that the corncutter would have been safer with this option than without it. He acknowledged that FMC probably realized that its corncutter machines would be used by migrant workers and minors.
 
 
 10
 FMC formed a Product Reliability and Safety Committee in 1968 to ensue that FMC's machines were safe. FMC recognized at the time that it had a duty to advise its customers if an unsafe condition existed on one of their machines. In 1974 FMC's Machinery Division Policy Guide on Product Safety summarized the company's long-standing policy that "[a] major objective of the machinery group is to design and manufacture products * * * which provide a high degree of safety for users, operators, and the general public for the products' intended use during its useful life." Prior to the shipment of the corncutter to Joan of Arc in 1969, FMC had received reports of people being injured on its corncutters. In April 1973 the Product Reliability and Safety Committee, prompted by the risk of a products liability lawsuit, recommended that should an FMC employee observe one of FMC's customers operating FMC-manufactured equipment without a guard, that employee should notify the sales department. The sales representative responsible for the account then should send a written warning by certified mail, return receipt requested, to a management employee of the customer. Management overruled these recommendations "for business reasons." Instead, FMC decided to instruct its employees to warn a management employee of the customer verbally and informally, but required documentation of warnings given.
 
 
 11
 No one at FMC mentioned to Joan of Arc supervisors that guards were missing from any of its machines, nor did anyone ever report to FMC that any of the guards were missing. Gayle Hambleton of FMC made a service call to Joan of Arc on August 11, 1975, but his report does not mention the missing guard. Hambleton and Rick Hall visited the plant on October 1, 1975, the year before the plaintiff was injured, to inspect the very machine in question for parts. Neither noted nor reported the guard as missing.
 
 
 12
 Davis' diversity action against FMC alleged two counts, Count One sounding in strict liability and Count Two sounding in tort. FMC denied all fault, claiming that plaintiff had been contributorily negligent, a contention that plaintiff denied. FMC also filed a third-party complaint against Joan of Arc on Count Two of Davis' complaint. This third-party complaint alleged that FMC was, at most, passively negligent and that Joan of Arc was subject to indemnity as being actively negligent, should FMC be found liable. The district court initially denied Joan of Arc's motion to dismiss this third-party complaint. 537 F.Supp. 466 (C.D.Ill.1982). At the close of the evidence, however, the district court granted Joan of Arc's motion for a directed verdict. After the jury returned a verdict of $75,000 for Davis against FMC, the trial judge set the verdict aside and ordered a new trial on the issue of damages alone. FMC appeals from the $326,620 verdict entered against it after the second trial. We have jurisdiction pursuant to 28 U.S.C. Sec. 1291.II
 
 
 13
 We consider first the appropriateness of the district court's directing a verdict in favor of Joan of Arc. Being a diversity case, the state law standard for directed verdicts governs. Robison v. Lescrenier, 721 F.2d 1101, 1103 (7th Cir.1983); Kuziw v. Lake Engineering Co., 586 F.2d 33, 35 (7th Cir.1978). Illinois applies the principle enunciated in Pedrick v. Peoria & Eastern Railroad, 37 Ill.2d 494, 510, 229 N.E.2d 504 (1967), that "verdicts ought to be directed * * * only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." This formulation does not require a complete absence of evidence supporting the side against whom the verdict is directed, but rather necessitates a substantial factual dispute before a jury trial is required:
 
 
 14
 As the light from a lighted candle in a dark room seems substantial but disappears when the lights are turned on, so may weak evidence fade when the proof is viewed as a whole. Constitutional guaranties are not impaired by direction of a verdict despite the presence of some slight evidence to the contrary * * *, for the right to a jury trial includes the right to a jury verdict only if there are factual disputes of some substance.
 
 
 15
 Id. at 504-505, 229 N.E.2d 504 (citations omitted). A review of Illinois law on indemnity actions when a party is sued in negligence demonstrates the correctness of the district court's order directing a verdict for Joan of Arc.
 
 
 16
 Illinois does not allow contribution for causes of action like this arising out of occurrences prior to March 1, 1978. Skinner v. Reed-Prentice Division Package Machinery Co., 70 Ill.2d 1, 17, 15 Ill.Dec. 829, 374 N.E.2d 437 (1977) (allowing contribution for causes of action arising out of occurrences on or after March 1, 1978), certiorari denied sub nom. Hinckley Plastic, Inc. v. Reed-Prentice Division Package Machinery Co., 436 U.S. 946, 98 S.Ct. 2849, 56 L.Ed2d 787. In certain, very limited, circumstances, however, indemnity is available. A defendant who is only passively negligent may shift the entire loss to a party that is primarily and actively negligent. The terms "active" and "passive" negligence are words of art, requiring a very fact-specific inquiry and a qualitative difference between the two parties' actions. See Robinson v. International Harvester Co., 44 Ill.App.3d 439, 442-443, 3 Ill.Dec. 150, 358 N.E.2d 317 (5th Dist.1976), reversed on other grounds, 70 Ill.2d 47, 15 Ill.Dec. 850, 374 N.E.2d 458 (1977) (citing cases). The Supreme Court of Illinois has generalized that cases allowing indemnity have been those cases in which "the dangerous condition that caused the injury was created by the defendant [in the indemnity action], and [indemnitee] plaintiff's negligence amounted to no more than the failure to discover and remedy it." Chicago & Illinois Midland Railway v. Evans Construction Co., 32 Ill.2d 600, 604, 208 N.E.2d 573 (1965). Alternatively, an indemnity may be obtained if the plaintiff can show that the defendant breached a duty, not also owed by the plaintiff in the indemnity action, to make land or chattels safe to the injured person. Id. at 605-607, 208 N.E.2d 573. Accord Carver v. Grossman, 55 Ill.2d 507, 513, 305 N.E.2d 161 (1973) (rejecting indemnity action because defendant was not principal wrongdoer or the one whose wrong had been principally responsible for the injury; both parties owed the injured person the same duty, which they both breached). If the two parties' negligence is of equal significance, then indemnity is not permitted. Moody v. Chicago Transit Authority, 17 Ill.App.3d 113, 117, 307 N.E.2d 789 (1st Dist.1974).
 
 
 17
 Indemnity is unavailable for strict liability actions. See, e.g., Burke v. Sky Climber, Inc., 13 Ill.App.3d 498, 504-505, 301 N.E.2d 41 (1st Dist.1973), affirmed on other grounds, 57 Ill.2d 542, 316 N.E.2d 516 (1974).[1] Consequently FMC can use the active-passive indemnity theory to escape liability, if at all, only from liability on Davis' claim of negligence. The Illinois Appellate Court explained the differences between a strict liability action and a cause of action based on ordinary negligence in Kossifos v. Louden Machinery Co., 22 Ill.App.3d 587, 591, 317 N.E.2d 749 (1st Dist.1974):
 
 
 18
 In a cause of action based on ordinary negligence a plaintiff must show that a defendant owed the non-negligent plaintiff a duty of reasonable care and then either failed to do something which a reasonably careful person would have done, or did something which a reasonably careful person would not have done under circumstances identical to those in a given case. * * * It is obvious that the basis of strict liability in tort is the condition of a product whereas the basis of negligence is the conduct of a person. (Citations omitted.) (Emphasis in original.)
 
 
 19
 Consequently, "[i]n a negligence situation, the focus is not on the unreasonably dangerous condition of a product or instrument, but rather on the conduct of the defendant." Id. Of course, a product's unreasonably dangerous condition may result from a person's conduct, but it does not necessarily do so. Whether it did or not is irrelevant, because the inquiry focuses solely on the condition of the product. Id.
 
 
 20
 FMC places heavy reliance on the district court's previous order, reported at 537 F.Supp. 466, denying Joan of Arc's motion for a directed verdict at the pleading stage. FMC contends that if it could survive Joan of Arc's motion to dismiss at the pleading stage, then the possibility existed that it could prove its passive negligence claim. This much is true. FMC errs by arguing further that the evidence supported its passive negligence claim, and by believing that mere negligence by Joan of Arc could relieve FMC of liability to Davis. These inferences overstate the reach of Illinois case law. FMC could prevail on its claim if it could establish that Joan of Arc acted intentionally in injuring Davis, or if it could establish that the injury arose independent of any negligent conduct by FMC. See Robinson v. International Harvester Co., 44 Ill.App.3d at 444, 3 Ill.Dec. 150, 358 N.E.2d 317 (considering effect on manufacturer's indemnity claim of alleged intentional action of employer and multipurpose nature of defective machine).
 
 
 21
 Campbell v. Joslyn Manufacturing & Supply Co., 65 Ill.App.2d 344, 350-351, 212 N.E.2d 512 (3d Dist.1965), cited by defendant, does not support its position. The court there said merely that a third-party complaint for indemnity should not be dismissed at the pleading stage simply because the complaint alleges that the defendant was actively negligent. Instead,
 
 
 22
 A determination as to whether the negligence is active or passive could not be made until all of the evidence is heard at the time of trial. After hearing the evidence, the trial court can then determine whether the third party should or should not be entitled to recover as a matter of law or whether the issue should be submitted to the jury for determination.
 
 
 23
 Id. at 351, 212 N.E.2d 512 (emphasis supplied). Accord Stanfield v. Medalist Industries, Inc., 17 Ill.App.3d 996, 999, 309 N.E.2d 104 (2d Dist.1974). The court below did precisely what these cases contemplate. It refused to dismiss the third-party complaint at the pleading stage but allowed FMC full opportunity to introduce evidence. Determining, after all the evidence had been introduced, that FMC if proven to be negligent was at least as negligent as Joan of Arc, the district court then dismissed the third-party complaint as not sustaining its allegations that FMC was at best passively negligent. The district court did not determine whether FMC's conduct was negligent. It left that determination to the jury, concluding only as a matter of law that if FMC were negligent, then that negligence was not qualitatively different from Joan of Arc's negligence in removing the guard so that indemnity was unavailable.
 
 
 24
 We agree. FMC has cited no case to us in which the manufacturer has prevailed against an employer on its claim of indemnity, and our research has disclosed no such case to us.[2] Furthermore, Illinois courts have never said that a manufacturer, if proven negligent, was only passively negligent; they have merely allowed pleadings to stand to enable the manufacturer to prove that its conduct was not negligent at all or that the injury arose because of a third party's intentional act. See Stanfield v. Medalist Industries, Inc., supra; Campbell v. Joslyn Manufacturing & Supply Co., supra. Cases allowing indemnity complaints to survive the pleading stage to enable the third-party plaintiff to prove that the third-party defendant "was the real party at fault and that [third-party] plaintiff's liability was derived from a relationship which did not involve negligence or misconduct on his part," Stevens v. Silver Manufacturing Co., 41 Ill.App.3d 483, 489, 355 N.E.2d 145 (2d Dist.1976), reversed on other grounds, 70 Ill.2d 41, 15 Ill.Dec. 847, 374 N.E.2d 455 (1977), are inapposite to the situation facing us. Cf. Bloodsaw v. Corbetta Construction Co., 86 Ill.App.3d 52, 41 Ill.Dec. 378, 407 N.E.2d 876 (1st Dist.1980) (involving unique provisions of Structural Work Act); Blaszak v. Union Tank Car Co., 37 Ill.App.2d 12, 184 N.E.2d 808 (1st Dist.1962) (lessor of car who might be liable solely because it owned car). An Illinois appellate court explained in Burke v. Sky Climber, Inc., supra, that
 
 
 25
 [s]imple failure of a person in ordinary circumstances to discover a defect might be described as passive; but, in the type of situation shown here, where Sky Climber itself is the manufacturer, it follows necessarily that the basis of the liability would be the active creation of the defect in the process of manufacture.
 
 
 26
 13 Ill.App.3d at 502-503, 301 N.E.2d 41. This statement harmonizes with those Illinois Supreme Court cases synthesizing successful indemnity cases as situations in which the only fault of the indemnitee was in failing to discover a defect. See Chicago & Illinois Midland Railway v. Evans Construction Co., supra.
 
 
 27
 Ample evidence in the record convinces us that FMC's conduct did not qualitatively differ from that of Joan of Arc. The ease with which a standard corncutter could be modified to an opposite standard corncutter means that any canning facility that changed its method of feeding corn into the machine would normally reverse the rails rather than purchase an entirely new machine. Reversing the rails would necessitate discarding the former guard on the machine. If FMC was negligent, it would have been because FMC foresaw or should have foreseen that its customers would remove the five-inch guard. This knowledge should have alerted FMC to the necessity of taking steps to prevent resultant injuries, such as providing other safety measures, making the guard nonremovable, providing warning devices on the machine itself more durable than the easily washed-off decal, or warning Joan of Arc of the danger of operating its corncutters without guards. FMC failed to take any of these steps. It had sold only 157 guards, so that it could not reasonably have expected its customers to purchase guards compatible with their modified machines. Although Joan of Arc was negligent in not ensuring that its machines carried adequate protection, its negligence was made possible in the first place by the conduct of FMC in negligently failing to ensure its machines provided some modicum of protection to users.
 
 
 28
 FMC's argument that it is entitled to indemnity because it owed Davis a different duty from that owed by Joan of Arc lacks merit. FMC contends that its duty was merely "to manufacture a reasonably safe machine," while Joan of Arc was obligated "to provide the plaintiff with a reasonably safe machine for the performance of her duties" (R.Br. at 31). We perceive no meaningful distinction between the two duties. If FMC foresaw or should have foreseen that Joan of Arc would remove the detachable guard, then it is equally culpable because it took no steps to remedy the danger of an unguarded machine. Both FMC and Joan of Arc owed Davis a duty to provide her a reasonably safe machine, and both breached that duty. See infra pp. 233 - 234. That being so, FMC cannot escape responsibility by means of an indemnity action.
 
 
 29
 This case does not present the problem of a multipurpose machine. See Rios v. Niagara Machine & Tool Works, 12 Ill.App.3d 739, 299 N.E.2d 86 (1st Dist.1973), affirmed on other grounds, 59 Ill.2d 79, 319 N.E.2d 232 (1974). The corncutter that injured plaintiff was not a multipurpose machine. It was modifiable, so that it could use two slightly different methods of feeding ears of corn into the machine, but its essential function was the same. The Illinois Supreme Court, in affirming Rios, expressly declared that the multifunctional nature of a product would not be decisive of the question whether a product was unreasonably dangerous. The simple provision of an interlock device, or making the guard that FMC did provide a permanent part of the machine's housing, would have prevented the injury that the plaintiff received. Robinson v. International Harvester Co., supra, correctly recognized:
 
 
 30
 The manufacturer can not shift the responsibility of installing the necessary safety devices upon the purchaser-employer and thereby retain a passive negligence status. * * * The determination that any negligence involved in the manufacture of the [machine] would be active remains unaffected by the multifunctional nature since the manufacturer cannot delegate to the purchaser-employer the duty to purchase and install equipment necessary for a reasonably safe product.
 
 
 31
 44 Ill.App.3d at 444, 3 Ill.Dec. 150, 358 N.E.2d 317.
 
 
 32
 In Wells v. Web Machinery Co., 20 Ill.App.3d 545, 315 N.E.2d 301 (1st Dist.1974), the Illinois Appellate Court considered a plaintiff's claim against the manufacturer of a machine containing only one safety device that the manufacturer realized would one day fail. The court castigated the manufacturer's "calloused disregard" for the operators' safety, where the manufacturer had actually foreseen the possible harm caused and did nothing. Id. at 552-553, 315 N.E.2d 301. Because the manufacturer was aware of the danger and the injury that would result, the court failed "to discern how either [the manufacturer] or [the distributor] can be said to have been passively negligent." Id. at 561, 315 N.E.2d 301. Consequently the court rejected their claim for indemnity from the employer. The facts in Web are more egregious than the ones in the instant situation. Nonetheless FMC's conduct in disregarding the safety problems of an unguarded machine cannot constitute passive negligence as that term has been understood in Illinois law. Therefore FMC cannot claim a degree of negligence any different from Joan of Arc's in removing the guard, and the district court's dismissal of the third-party complaint was proper.
 
 III
 
 33
 Federal, not state, law controls our review of the court below's grant or denial of a new trial. Wiedemann v. Galiano, 722 F.2d 335, 337 (7th Cir.1983); General Foam Fabricators, Inc. v. Tenneco Chemicals, Inc., 695 F.2d 281, 288 (7th Cir.1982).[3] Granting a party's motion for a new trial is proper when "the trial was not fair to the party moving." Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 251, 61 S.Ct. 189, 194 85 L.Ed. 147. Appellate review of the trial judge's decision "is extremely limited because of his superior ability, by virtue of having observed the jury at first hand, to assess its fairness and competence." Abernathy v. Superior Hardwoods, Inc., 704 F.2d 963, 971 (7th Cir.1983).
 
 
 34
 The trial court gave several reasons for granting a new trial, only one of which we need consider here. "The misconduct of counsel * * * justifies a new trial where that misconduct prejudiced the adverse party." Wiedemann v. Galiano, 722 F.2d at 337. FMC's argument in its closing remarks to the jury that Joan of Arc's conduct in removing the guard was the sole proximate cause of the plaintiff's injury constitutes just such prejudicial conduct. The district court's dismissal of Joan of Arc determined as a matter of law that regardless of Joan of Arc's negligence, FMC would be liable to the plaintiff for her injuries if she could establish that FMC acted in a negligent manner. FMC was free to argue that it was not negligent in any way in selling the machine to Joan of Arc without better protection, that it could not have foreseen that Joan of Arc might remove the detachable guard, and that it was not negligent in failing to take any curative steps when it was placed in a position to realize that the guard had been removed. The question for the jury was not whether Joan of Arc was negligent, but whether FMC was also negligent. By focusing on Joan of Arc's conduct in its closing arguments, FMC was able to direct the jury's attention to Joan of Arc's share in causing the plaintiff's injury. Because Illinois law for the relevant time period does not permit contribution between joint tortfeasors, FMC was impermissibly arguing to the jury that its own liability should be decreased due to Joan of Arc's equal--but not qualitatively different--wrongdoing. In granting the plaintiff's motion for a new trial, the trial judge recognized that
 
 
 35
 [i]f FMC and Joan of Arc were each guilty of conduct of the same quality which proximately contributed to the plaintiff's injuries, then Joan of Arc's conduct, as a matter of law, could not have been the sole proximate cause of the plaintiff's injuries. * * * When FMC failed to establish its claim for indemnity against Joan of Arc, it lost the right to argue sole proximate cause.
 
 
 36
 Order of October 19, 1983, at 3-4 (citation omitted).
 
 
 37
 The first jury verdict in favor of the plaintiff did not necessarily establish that FMC's conduct was negligent. The jury could have premised its verdict against FMC on a finding that FMC, although not negligent, had nevertheless manufactured a machine that was in an unreasonably dangerous condition when it left FMC's control in 1969. We find it hard to imagine how this unreasonably dangerous condition--if that was in fact all the jury decided--could have been caused by anything other than negligent conduct on the part of FMC. FMC had received reports of people being injured on its corncutter machines prior to shipping the machine in question to Joan of Arc in 1969. FMC continued to receive such reports, and its Product Reliability and Safety Committee recommended steps to cope with the danger posed by machines being operated without guards, a danger that the Product Reliability and Safety Committee realized was FMC's duty to rectify. Business reasons prompted FMC's top management to overrule these recommendations, but the Committee's proposal establishes that FMC not only should have realized the guards would be removed, but indeed did know both that its customers were doing so and that the lack of guards increased the risk of injury to an operator. The guidelines that FMC claims to have instituted evidently were not followed, because no records or testimony were introduced that would establish that FMC employees had ever noted the absence of guards or warned Joan of Arc supervisory employees about the danger the absence of guards posed--despite a parts check of the very machine that injured the plaintiff the year before her injury (when the guard would necessarily have had to have been removed, due to Joan of Arc's using a belt-feed system at its Hoopeston plant). Consequently the jury verdict against FMC must have encompassed a determination of negligence.
 
 
 38
 FMC's own expert admitted that twenty-five years before FMC manufactured and shipped the corncutter at issue to Joan of Arc, good engineering practice required either making a guard a permanent part of a machine or interlocking it to prevent the machine's being operated should the guard be removed. FMC failed to do both, despite its having received reports of users being injured on its corncutters. Considering that both the rails and the guard itself were easily removable, FMC knew or should have known that its customers would modify their corncutters to convert from one feed system to another when necessary, and that these modifications would leave their machines devoid of any safety protections. We reject FMC's characterization of its conduct, in its brief, as "an unintentional failure to achieve absolute safety" (Br. at 38), given the overwhelming evidence that FMC deliberately violated known safety practices in manufacturing the corncutter it shipped to Joan of Arc, and that it then intentionally failed to institute any steps to correct the dangerous condition it allowed to occur. The inference FMC makes that the corncutter that it manufactured was reasonably safe was against all the evidence, because a customer's modifying its corncutters and therefore removing the guard was foreseeable by FMC. Yet FMC took no means, measures that were available and feasible in 1969 when it manufactured the machine, to prevent the accident it must have foreseen. Nor did it institute procedures to communicate warnings effectively to its customers. This conduct represents a classic case of negligence. The least FMC could have done would have been to make the five-inch guard nondetachable, or to interlock the machine so it would not operate if the guard mechanism were not in place.
 
 
 39
 The small amount of damages originally awarded the plaintiff supports the trial court's determination that FMC's improper argument had indeed confused the jury, altered their calculation of damages, and prejudiced the plaintiff. The amount awarded was only a small fraction of what had been requested. The plaintiff, who was right-handed, had had to have three and a half fingers of her right hand amputated. The amputation left her permanently disfigured and unable to pursue her chosen occupation of being a secretary. Evidence that the plaintiff introduced established that she had had significant employment problems due to her disability and had been forced into low-paying jobs. Many of the daily tasks that most people perform without a thought have become extremely difficult and painful for the plaintiff to execute, if she can accomplish them at all. Cooking is impossible, because she can't handle knives or grasp pots and pans. Neither can she sew or play the piano. Given the jury's determination of liability, the sum originally awarded was paltry when one considers the substantial and permanent injuries that plaintiff incurred and the impact of inflation on the value of damage awards. The only explanation for the small sum awarded is that FMC's argument concerning Joan of Arc's part in contributing to plaintiff's injuries unfairly influenced the jury's deliberations. The district judge's grant of a new trial was not an abuse of discretion, and therefore we affirm his order.
 
 
 40
 The plaintiff's request for a reconsideration of the trial court's denial of punitive damages was phrased in the alternative, being relief plaintiff requested only if we reversed the trial court's grant of a directed verdict and ordered a new trial. Plaintiff confirmed our understanding that this request was in the alternative at oral argument. Since we are affirming both the district court's grant of a directed verdict to Joan of Arc and its order of a new trial, we do not need to consider the issue of punitive damages. The district court's judgment is affirmed.
 
 
 
 *
 The Honorable John W. Peck, Senior Circuit Judge of the United States Court of Appeals for the Sixth Circuit, is sitting by designation
 
 
 [1]
 Evidently the Illinois Supreme Court changed this rule prospectively for actions based on occurrences on and after March 1, 1978, in Stevens v. Silver Mfg. Co., 70 Ill.2d 41, 44-46, 15 Ill.Dec. 847, 374 N.E.2d 455 (1977). The court there characterized a claim for indemnity as a claim for partial indemnity or contribution and so allowed it to proceed, despite the plaintiff's complaint sounding only in strict liability
 
 
 [2]
 Vassolo v. Comet Indus., Inc., 35 Ill.App.3d 41, 341 N.E.2d 54 (1st Dist.1975); Kossifos v. Louden Machinery Co., supra; Stanfield v. Medalist Industries, Inc., supra, all held simply that indemnity is unavailable to the defendant in a strict liability action
 
 
 [3]
 Abernathy v. Superior Hardwoods, Inc., 704 F.2d 963, 970-971 (7th Cir.1983), provides an interesting discussion and attempts to resolve the possible inconsistency in consulting state law on reviewing directed verdicts and judgments notwithstanding the verdict, but federal law on the grant or denial of a new trial. Other circuits apparently apply federal law on both types of questions. Here we have followed our more recent cases and applied the state standard in reviewing the district court's grant of a directed verdict. Applying the federal rule, however, would not have affected the result reached. See Boeing Co. v. Shipman, 411 F.2d 365, 374-375 (5th Cir.1969) (en banc) (setting out federal standard)